LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

A PROFESSIONAL CORPORATION

29 B R O A D W A Y
Suite 1412
NEW YORK, NEW YORK  10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                                    STEVEN WRIGHT
— *Office Manager*

LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

April 1, 2015

**FILED UNDER SEAL**

The Honorable Loretta A. Preska
Chief United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:      *United States v. Kevin Henderson*,
12 Cr. 863 (LAP)

Dear Chief Judge Preska:

This letter constitutes the sentencing submission of behalf of defendant Kevin Henderson, whom I represent by CJA appointment in the above-entitled case.  For the reasons set forth below, it is respectfully submitted that Mr. Henderson should be sentenced to a prison term commensurate with the Sentencing Guidelines for his offense of conviction, which prescribe a Guidelines range of 41-51 months, rather than the far more severe Career Offender Guidelines range of 151-188 months.

Also, this letter is submitted under seal because it includes sensitive personal background information about Mr. Henderson,███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████.

As detailed below, even though Mr. Henderson's criminal history qualifies him as a Career Offender, analysis of the factors enumerated in 18 U.S.C. §3553(a)(1)-(7) establishes that a far shorter prison sentence than prescribed by the Career Offender Guideline is "sufficient, but not greater than necessary" in this case in order to achieve the purposes of sentencing set forth in §3553(a)(2).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 2 of 53

In particular, it is respectfully submitted that the following factors are pertinent to the Court's consideration:

(a)     Mr. Henderson's difficult personal and family background, as described in the both the Pre-Sentence Report and the letters submitted on his behalf, including being abandoned by both parents, shuttled among a series of foster homes – at which he was neglected███████████████████– and ultimately cast out on the street to fend for himself as a teenager;

(b)     the recent personal tragedy Mr. Henderson – the death of his fiancée, and mother of their nine-year old child, from kidney failure – has experienced while incarcerated;

(c)     Mr. Henderson's genuine, exemplary, and considerable commitment to rehabilitation he has manifested while in custody at the Metropolitan Detention Center, and during his pre-existing New York State prison sentence (emanating from the same course of conduct as charged in the conspiracy to which he pleaded guilty to in this case, and which he was serving when arrested by federal authorities in this case), and which he has expressed in his letter to the Court (attached hereto as Exhibit 1);

(d)     Mr. Henderson's role in the offense, which consisted of street sales of a modest quantity of crack cocaine;

(e)     the inequities inherent in the Career Offender enhancements, which have motivated many judges to sentence defendants in circumstances analogous to Mr. Henderson's to terms of imprisonment well below the Career Offender Guidelines range(s);

(f)     that, as courts have determined, the deterrent purpose of the Career Offender Guidelines enhancements is not served or achieved by imposing long sentences on those who have not yet served extended prison sentences for their prior offenses;

(g)     a sentence within the Career Offender Guidelines range in this case would create an unwarranted disparity and/or uniformity in contravention of §3553(a)(6) because, as courts have recognized in similar situations:

(i)     it would improperly equate Mr. Henderson, a street-level seller,  with "kingpin" drug traffickers with prior criminal records reflecting high-

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

> volume drug sales;

> (ii)    the vast majority – 65.7% in 2010 – of defendants subject to Career Offender Guidelines are sentenced *below* the applicable Career Offender range;

> (iii)    as discussed **post**, at 26-27, within the Second Circuit and Southern District of New York, to the extent such statistics are available to defense counsel,
> defendants facing Career Offender Guidelines ranges, but whose specific offense conduct generated a far lower Guidelines range, have been sentenced to terms of imprisonment dramatically shorter than the range prescribed by the Career Offender Guidelines.  Indeed, that has already been the case with respect to those other defendants in this case who, despite facing Career Offender Guidelines ranges, have been sentenced by the Court to prison terms substantially below those ranges;  and

> (iv)    that predominant proportion of sentences below the prescribed Career Offender Guideline range, and the *degree* historically within this District, renders any sentence *within* that range necessarily disparate, particularly when the drug weight involved and nature of Mr. Henderson's prior record are considered.  In that context, it is also noteworthy that the most recent statistics published by the United States Sentencing Commission, discussed **post**, at 46-48, establish that during Fiscal Year 2014, 71.7% of sentences imposed in the Southern District of New York were below the applicable Guidelines range;  and

> (h)    the harsh conditions of pretrial confinement Mr. Henderson has endured for 18½ months at the Metropolitan Detention Center ("MDC") in Brooklyn.

Also, as detailed **post**, at 51-53, Guidelines §5G1.3(b) and/or (d) provide a basis for reducing Mr. Henderson's sentence by either or both reducing his sentence in this case to account for the period of incarceration he served in New York State prison pursuant to a New York State conviction and sentence for conduct that was part of the conspiracy charged in this case (and before he was transferred to federal custody), and/or by directing that the sentence in this case run concurrent with the remaining undischarged portion of another New York State sentence that was imposed at the same time, and concurrently, with that already-discharged term.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 4 of 53

I.      ***The Principles Governing Federal Sentencing Since* United States v. Booker,**
***543 U.S. 220 (2005), Require the Court to Look Beyond the Guidelines***
***In Order to Arrive at a Sentence Sufficient But Not Greater Than Necessary***
***to Achieve the Purposes of Sentencing Set Forth in 18 U.S.C. §3553(a)(2)***

The July 11, 2014, Plea Agreement between Mr. Henderson and the government
classifies Mr. Henderson as a Career Offender, and therefore calculates a total offense level of
32, and places him in Criminal History Category VI, resulting in an advisory Guidelines range of
151-188 months. *See* Draft Pre-Sentence Report (hereinafter "PSR"), at ¶ 120.  Absent the
Career Offender designation, Mr. Henderson's Offense Level, based on the conduct underlying
the offense of conviction [and including the three-level reduction for Acceptance of
Responsibility pursuant to §§3E1.(a) & (b)], would be 15, *see* PSR, at ¶¶ 64, 66-67, with a
corresponding Guidelines range (because his Criminal History score would still place him in
Category VI) of 41-51 months.

Yet the Guidelines calculation, under either the Plea Agreement or the PSR, merely
begins the analysis.  In that context, the PSR also fails to provide any guidance in navigating and
evaluating the relevant considerations under §3553(a), and arriving at a sentence "sufficient but
not greater than necessary" to achieve the goals listed in §3553(a)(2).  Rather, it merely hews to a
reflexive Guidelines-centric analysis without reference to any other factors listed in §3553(a),
and fails to recognize that a Guidelines-only approach was constitutionally dismantled by
*Booker*, and, in practical terms, has been overwhelmingly abandoned by the courts in this District
in the course of their continuing sentencing practice.

In *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229 (2011), the Court
*twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to
'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing
purposes set forth in § 3553(a)(2)."  *Id*., at 1242, 1243.  *See also United States v. Dorvee*, 604
F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's
duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific
purposes set forth' at 18 U.S.C. §3553(a)(2)"), *quoting United States v. Samas,* 561 F.3d 108,
110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee*,

[e]ven where a district court has properly calculated the
Guidelines, it may not presume that a Guidelines sentence is
reasonable for any particular defendant, and accordingly, must
conduct its own independent review of the §3553(a) sentencing

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 5 of 53

factors.  *See* [*United States v.*] *Cavera,* 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93.  *See also Pepper*, 562 U.S. at ___, 131 S. Ct. at 1244-45 (statute – 18 U.S.C. §3742(g)(2) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").

Thus, as the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts;  they are also not to be *presumed* reasonable." *Id.*, at 351 (emphasis in original).[1]  *See also Dorvee*, 604 F.3d at 93 ("[i]n conducting this review [of the §3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines – that is, they are truly advisory'"), *quoting Cavera,* 550 F.3d at 189.

Indeed, in *Pepper*, Justice Sotomayor again hearkened back to *Koon v. United States*, 518 U.S. 81 (1996) – as Justice Stevens had in *Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., *concurring*) – repeating that

> "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

562 U.S. at ___, 131 S. Ct. at 1239-40, *quoting Koon*, 518 U.S. at 113.

Therefore, while sentencing judges must still consider the Guidelines, *see* 18 U.S.C. §3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court must consider under §3553(a) as a whole.  *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005);  *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), *explaining United States v. Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005).

---

[1] While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*citing United States v. Booker*, 543 U.S. 220, 259-60 (2005)).  *See also Nelson*, 550 U.S. at 351.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 6 of 53

Also, as Justice Scalia noted in his dissent from the "remedial" opinion in *United States v. Booker,* 543 U.S. 220 (2005):

> [t]he statute provides no order of priority among all those factors, but since the three just mentioned [§§ 3553(a)(2)(A), (B) & (C)] are the fundamental criteria governing penology, the statute – absent the mandate of § 3553(b)(1) – authorizes the judge to apply his own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the Guidelines.

543 U.S. at 304-305 (Scalia, J., *dissenting in part*).

Moreover, the Supreme Court has been vigilant in ensuring that the Guidelines are genuinely advisory, and not merely a default sentence ratified by appellate courts by rote. For example, in *Nelson*, 550 U.S. at 350, the Court reiterated that "district judges, in considering how the various statutory sentencing factors apply to an individual defendant 'may not presume that the Guidelines range is reasonable.'" 550 U.S. at 351, *quoting Gall v. United States*, 552 U.S. 38, 50 (2007); *see also id*. ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").

The broad discretion afforded district courts to determine a sentence also conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990); *Jones*, 531 F.3d at 172, n. 6.

In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" 562 U.S. at ___, 131 S. Ct. at 1240, *quoting Wasman v. United States,* 468 U.S. 559, 564 (1984).[2]

---

[2] Indeed, the Court's opinion in *Pepper* opened with the following statement:

> [t]his Court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant-if not essential-to

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 7 of 53

As the Supreme Court directed in *Gall*, 552 U.S. at 49, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party."

Thus, here, in light of the analysis and application of the §3553(a) factors, the Court possesses sufficient discretion to impose a sentence below the Guidelines. A sentence premised upon analysis of the Guidelines exclusively, and an implicit but unmistakable presumption that the Guidelines, and *only* the Guidelines, prescribe a reasonable sentence, is in irreconcilable conflict with the Supreme Court's and Second Circuit's direction manifested in the series of cases discussed **ante**. Accordingly, the sentencing factors in §3553(a) provide the proper guidepost for determining for Mr. Henderson a sentence "sufficient, but not greater than necessary" to achieve the objectives of sentencing.

## II.   *Even Though Mr. Henderson Qualifies As a Career Offender, Application of the §3553(a) Factors Compels a Sentence Substantially Below His Applicable Sentencing Guidelines Range*

As discussed below, in applying to Mr. Henderson's both §3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), and the sentencing factors set forth in §3553(a)(1)-(7), it is respectfully submitted that a sentence substantially below the applicable Guidelines range is appropriate.[3]

─────────────────────

[the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

562 U.S. at ___, 131 S. Ct. at 1235, *quoting Williams v. New York,* 337 U.S. 241, 246-247 (1949).

[3]  The sentencing factors enumerated in §3553(a) are:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   need for the sentence imposed –

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 8 of 53

In considering those prescribed sentencing factors and identified purposes of sentencing,[4]

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for –

(A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [. . .];

(5)     any pertinent policy statement [. . .];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and

(7)     the need to provide restitution to any victims of the offense.

[4] Section 3553(a)(2) lists the following purposes of sentencing:

(2)     the need for the sentence imposed –

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training,

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 9 of 53

several aspects of Mr. Henderson's circumstances are relevant.  Either independently or in combination, they amply justify a sentence far below the Career Offender Guidelines range.

> **A.** *Mr. Henderson's Difficult and Previously Unaddressed Personal*
> *Background and History, Including a Recent Family Tragedy, and*
> *His Continuing Considerable Efforts at Post-Arrest Rehabilitation*

> **1.** *Mr. Henderson Endured a Difficult and Traumatic*
> *Youth, and Has Struggled to Escape the Emotional*
> *and Psychological Damage Inflicted by Years of Neglect*

Kevin Henderson was born December 8, 1981, to ████████████.  *See* PSR, at ¶ 95. He has never met his father, and has only vague memories of his mother.  Kevin has been told that he was raised primarily by his grandmother, from whom he took the last name Henderson, although he does not remember her at all.

As a consequence of his mother's crippling addiction to cocaine, Kevin and his younger sister, Angie████████, were removed from their mother's care when Kevin was five years old, and placed in separate foster homes.  *See* PSR, at ¶ 96.  Kevin does not know the impetus behind the removal, but does recall that his grandmother died before he and his sister were placed in foster care.  He and his sister did not have contact with each other after being separated, and were not reunited until almost 20 years later.  *See id.*, at ¶ 99.

Although Kevin recalls being visited by his mother early on while in foster care, she eventually stopped coming to see him, and despite learning many years later that his mother was somewhere in Brooklyn, he and his sister have been unable to reestablish contact with her.  *Id.* Neither Kevin nor his sister has any relationship with their father, aside from a single phone call in recent years during which their father told Angie he had no children, and hung up on her.

Between the ages of five and eight, Kevin was moved between at least five different foster homes in Brooklyn, the Bronx, and Manhattan.  *See* PSR, at ¶ 96.  He recalls spending a year with one or two of the families, but only a few months with the rest.  His foster families provided him with the bare minimum, and he spent the majority of his childhood relying on the kindness and concern of his friends' parents for anything beyond his most basic necessities.  *Id.* During his early school years, Kevin enduring bullying and teasing because of his worn out and tattered clothing, and began to dread attending school.

---

medical care, or correctional treatment in the most effective manner.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 10 of 53

In addition to the general neglect which too often accompanies foster care,[5] ████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████

At age eight, Kevin was placed with the Daltons, who eventually adopted him when he
was twelve years old.  *See* PSR, at ¶ 97.  When Kevin arrived, there was one other foster child
living there, but who was moved elsewhere after a few months. The Daltons, who were in their
late 50's when Kevin was placed with them, also had six adult children who were often at their
parents' house.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

Even after his adoption by the Daltons, Kevin continued to depend on friends from school
and the neighborhood, who had caring parents, to escape the discomfort and deprivation of his
home life  The Daltons were strict, inflexible, and distant.  Kevin does not know why they

---

[5]  There is extensive literature on the abysmal conditions in the foster care system during
the period of Mr. Henderson's placement in it.  *See, e.g.*, Betsy Krebs and Paul Pitcoff, *Reversing
the Failure of the Foster Care System*, 27 HARVARD WOMEN'S LAW JOURNAL 357, 359 (2004)
("[a]t all levels, the teens in its care are seen as 'problem children' who are difficult enough to
control without worrying about their future[] . . .  [T]he system reinforces maladaptive behavior
that backfires in situations beyond welfare bureaucracies.  . . . Children who have spent years in
the system are terribly good at relating the horror of the situations they have lived through, yet
they have had no experience articulating the skills, strengths, or value they can bring to an
employer, college, family, or friendship").  *See also* Leslie Kaufman and Benjamin Weiser*, "*In
Foster Care Review, Vows of Help and Vigilance," *The New York Times*, November 5, 2007,
available at <http://www.nytimes.com/2007/11/05/nyregion/05foster.html>;  Leslie Kaufman,
"Foster Children at Risk, and an Opportunity Lost," *The New York Times*, November 7, 2007,
available at <http://www.nytimes.com/2007/11/07/nyregion/07foster.html?_r=0>.

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 11 of 53

adopted him, as he never had good or close relationships with anyone in the family except for
Donna Dalton.  As the PSR notes, Kevin was often without sufficient food and clothing, and
more than once he was given the choice by his adopted parents to eat seafood, to which he had a
serious allergy, or nothing at all.  *Id.*  Kevin also developed asthma, from which he still suffers.
*See* PSR, at ¶ 104.

Despite enduring bullying and teasing during his early school years, Kevin enjoyed
school, preferring it to being at the house.  He was a solidly good student throughout his
academic career, and played basketball on the DeWitt Clinton High School team beginning in his
freshman year.  He did not have any disciplinary issues in or out of school until age 16.

During the pre-sentence interview, Kevin related that at 16 he was kicked out of his
adopted family's home by ██████, another of the Daltons's older children, because Kevin came
home late from basketball practice, arriving at the house around 4 p.m.  *See* PSR, at ¶ 97-98.
Like many of the Daltons' older children, ██████ did not live with the Daltons, but was often in
the house.  He had berated Kevin before for breaking his parents' rules, although he had never
before told Kevin to leave.  Again, although the PSR quotes ████████████ as confirming that
Kevin was told to leave because he did not "always adhere[]" to the Daltons's "rules against
coming home late and walking through the residence at night," ██████ did not reside with his
parents while Kevin lived there.  *See* PSR, at ¶ 98.

After he left the house, Kevin's adopted parents did not make any effort to contact or
reconcile with him, and the only Dalton family member who reached out to Kevin during the
ensuing years was Donna Dalton, with whom Kevin still maintains a good relationship.  *See*
Letter from Donna Dalton, attached hereto as Exhibit 2.  For the next two years, Kevin bounced
around his friends' homes, and began forming friendships with the older drug dealers in the
neighborhood, who would often give him lunch money in exchange for Kevin performing
various odd jobs or tasks, like charging their phones or acting as a lookout.  *See* PSR, at ¶ 99.

Kevin's first arrest, in February 1998, occurred approximately eight months after he
moved out of the Daltons's home, and while he was living at a friend's house.  *See* PSR, at ¶ 70.
The incident emanated from a particularly contested basketball game, and a fight that broke out
between the two teams.  Kevin had never been arrested before;  nor had he ever previously been
in trouble at school.

One of the factors that courts have examined in the sentencing context is the lack of a
positive paternal influence.  That condition for Kevin throughout his life warrants a sentence
within the Guidelines range for his specific offense conduct, and not the Career Offender range.
*See*, *e.g.*, *United States v. Armstrong*, 2008 WL 5459177, at *2 (E.D.N.Y. Dec. 22, 2008) (court

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 12 of 53

observing, in sentencing defendant to half the Guidelines range, that "[t]he offense is serious. The defendant was a member of a gang that disturbed the peace and threatened the safety of a public housing project.  [But the defendant's] childhood was affected by inadequate parental control");  *see also United States v. Petit*, 09 CR 455 (JBW), 2010 WL 1727822, at *2 (E.D.N.Y. Apr. 9, 2010) (imposing sentence of probation instead of within Guidelines range of 27-33 months because "the offense is a serious one, the defendant is a peaceable, well-motivated young man, who has tried to make the best of a bad childhood.  Defendant had abusive parents, and was raised in various foster homes from the age of six");  *United States v. Serrano*, 08 CR 612 (JBW), 2010 WL 147924, at *2 (E.D.N.Y.) (E.D.N.Y. Jan. 11, 2010) ("[t]he offense is serious in view of the dangers posed by firearm possession.  Defendant was a troubled child who had problems in school from a young age and was sent to a school for children with emotional disturbances.  He is young and has a supportive mother and several supporting siblings.  He has accepted responsibility for this offense.  A sentence of 36 months reflects the seriousness of the offense, and will promote respect for the law and provide just punishment").

Although Kevin continued to attend school, and even play on the Clinton basketball team following that first arrest and conviction, his criminal record began to grow, as did his drug and alcohol use, which began socially when he was in his late teens.  *See* PSR, at ¶ 107-09.  Kevin was eventually taken in by Aida Rice, who considers him family and refers to him as her nephew. *See* Letter from Aida Rice, attached hereto as Exhibit 3.

Ms. Rice not only allowed Kevin to live in her home, but she was instrumental in reuniting him with his sister, has continued to try to help him find his mother, and most importantly, treats him as a member of her family.  Helena Jones, a longtime friend of Kevin's, related that Kevin has shared with her many times that "he aspires to be like his aunt [Ms. Rice]." Letter from Helena Jones, attached hereto as Exhibit 4.

All of the letters written on Kevin's behalf share the same sentiment as Ms. Rice's letter. Despite a childhood spent abandoned and neglected, Kevin grew into a compassionate, humble, kind, and generous man whose bad choices do not reflect a propensity toward criminal activity, but rather his own estimation of his limited value as a person.

Another friend of Kevin's, Jonathan Smith, observed that despite spending his youth with people who remained essentially strangers to him, Kevin "has shown no signs of being hateful or angry," an achievement in itself.  *See* Letter from Jonathan Smith, attached hereto as Exhibit 5. Similarly, Kangela Harris, a longtime neighbor of the Daltons, describes Kevin as "respectful" since childhood, as well as "honest, reliable, loving and caring," despite being "a lost child who grew up in the foster care system, looking for family love, with no structure or adequate guidance."  *See* Kangela Harris Letter, attached hereto as Exhibit 6.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 13 of 53

In that context, despite his early and traumatic separation from his immediate family, Mr. Henderson enjoys strong support from the friends who have written on his behalf.  As their letters attest, together they form a committed network dedicated to making any future criminal activity by Mr. Henderson highly unlikely, if not impossible.  *See, e.g., United States v. Hernandez-Castillo*, No. 05 Cr. 1033 (RWS), 2007 WL 1686686, at *5 (S.D.N.Y. Jun. 7, 2007) ("pursuant to § 3553(a)(1), the Court takes note of the significant network of friends and family that is ready to support Hernandez-Castillo upon his release from prison").

> **2.       *Mr. Henderson's Fiancé, Nicole███████, Recently Succumbed to a Lengthy Illness, Leaving Their Nine-Year Old Daughter Parentless***

Fortunately for Mr. Henderson, he was able to experience, even if only briefly, the kind of familial love he had been seeking for so many years.  In Nicole█████, to whom he was devoted, and their nine-year old daughter,█████, Mr. Henderson found his family.  However, as noted in the PSR, at ¶ 100, Nicole█████died May 18, 2014, while Mr. Henderson was incarcerated, after a long struggle with kidney disease.

Mr. Henderson and Nicole█████ met in 2005 at a baby shower, and they immediately began dating.  By 2006, Nicole was pregnant with their first and only child,█████.  Nicole was only 25 years old when she developed kidney problems, seemingly brought on by the pregnancy.  ████████████████████████████████████████████████████████████████ ████████████████████████████████.  Nicole had been healthy all her life, and there was no family history of kidney problems.  However, after█████was born premature, Nicole's kidneys began to fail.  Both mother and child remained in the hospital well after the birth – Nicole for five months and █████for a whole year.

As a baby, █████was very ill, but she was completely recovered by age three, and is now nine years old.  However, Nicole's health continued to decline, and in 2007 she began dialysis.  Four times a week, or more if it was necessary, Nicole would spend approximately three hours undergoing dialysis.  On the days when she received dialysis treatment, she was so exhausted when she returned that she spent most of the day recovering.  Mr. Henderson handled all of the day to day activities, from cooking and cleaning to food shopping to caring for█████████████ ████████████████████████████████████████████████████████ ██████████████████████████.

For instance, Mr. Henderson would wake Nicole at the same time he woke█████for school, even though Nicole did not need to be at dialysis until 11a.m., because just waking up, getting dressed and eating breakfast were lengthy and difficult tasks for her.  On days when she did not have dialysis, the family spent more time together, but Mr. Henderson explained that

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 14 of 53

Nicole still had a difficult time maintaining her energy, ███████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████.

However, as with any routine, even a difficult one, Mr. Henderson, Nicole and ██████ adjusted. ███████ helped whenever she could, picking out her mother's outfits for the day and sleeping in her parents' bed to spend more time with her mother. Although it would be uplifting to state that Mr. Henderson's criminal activity completely ceased during this time, it is not true. Mr. Henderson's sister, his friends, and Nicole's mother helped when he was not there, and Nicole and Mr. Henderson's relationship stayed strong.

In fact, Mr. Henderson's plans to donate a kidney to Nicole, mentioned at ¶ 100 of the PSR, interrupted by his arrest in this case, were conditioned on his promise to Nicole that they would marry first. In addition, despite the PSR's cursory dismissal of their relationship (*id.*), Mr Henderson is very close to his daughter, as he was her primary caregiver for most of her life. Even when incarcerated, Nicole and ██████ visited him, and until Nicole's death, there was no significant period during which Mr. Henderson did not see his daughter regularly.

Mr. Henderson's devotion to his family is another characteristic described in many of the attached letters of support. *See, e.g.,* Letter from Apryl Jones, attached hereto as Exhibit 7; *see also* Letter from Angela Lancaster, attached hereto as Exhibit 8. Mr. Henderson described Nicole as his support system. For example, she was the impetus behind his decision to seek treatment for alcoholism in 2010, and Mr. Henderson has since abstained from alcohol use. *See, e.g.,* PSR, ¶ 109.

In May 2014, Nicole died of complications related to kidney failure. Mr. Henderson learned of her death on social media, and was unable to obtain permission to attend Nicole's funeral in time. After Nicole's death, Mr. Henderson spoke first with Nicole's mother, who took custody of ███████, but was not able to speak to his daughter until approximately three weeks later. Nicole's mother has not brought ██████ to see Mr. Henderson since Nicole's death, although he speaks and writes to his daughter regularly.

As is clear from Mr. Henderson's letter, the decisions which led to his arrest in this case, and consequently have kept Mr. Henderson from being there for ██████ "when she needs [him] the most," are the most significant regrets of his life. *See* Letter from Kevin Henderson (hereinafter "Henderson Letter"), attached hereto as Exhibit 1. He writes "I now understand life from a different perspective," and "I know the true meaning and value of a family and freedom as my daughter and other members of our family are constantly praying for my well-being." *Id.*

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 15 of 53

As Judge Weinstein pointed out in *United States v. Bannister*, 786 F. Supp.2d 617
(E.D.N.Y. 2011), "[i]ncarceration affects the lives not only of prisoners but of those around
them." *Id.*, at 653.  As Judge Weinstein elaborated in *Bannister*,

> [p]risoners' children may experience numerous consequences of
> incarceration, including loss of contact with the incarcerated
> parent, strained relationships with caregivers, a diminished sense of
> stability and safety, economic insecurity, social stigma, shame,
> increased risk of drug involvement, and susceptibility to adverse
> peer pressure and risky behavior.  *See generally* Patricia Allard &
> Judith Greene, *Justice Strategies, Children on the Outside: Voicing
> the Pain and Human Costs of Parental Incarceration* (2011),
> available at http://www.
> justicestrategies.org/sites/default/files/publications/JS–COIP–1–13
> –11.pdf.

786 F. Supp.2d at 653.

As a result, "[t]hese children are at 'greater risk of diminished life chances and criminal
involvement, and at a greater risk of incarceration as a result.'."  *Id.*, *quoting* Bruce Western &
Becky Pettit, *Incarceration and Social Inequality,* Daedalus, Summer 2010, [hereinafter
"Western & Pettit"], at 16.  Reflecting upon the connection between such adverse impact and the
racial disparity in prosecution and sentencing, Judge Weinstein added that "[a]s with
incarceration itself, these adverse effects are multiplied when racial disparity is taken into
account."  *Id.*, at 653.

For example,

> [i]n 2008, 11 percent of African American children had lived with
> a parent being locked up, compared to 1.75 percent of White
> children.  [Western & Pettit],  at 16.  High incarceration affects
> communities as well.  Disadvantaged communities are more likely
> to send more persons to prison, increasing their likelihood of
> becoming even more troubled in the future.  *See* Robert J. Sampson
> & Charles Loeffler, *Punishment's Place: The Local Concentration
> of Mass Incarceration*, *Daedalus*, Summer 2010, at 20.  "[T]he
> combination of poverty, unemployment, family disruption, and
> racial isolation is bound up with high levels of incarceration even

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 16 of 53

> when adjusting for the rate of crime that a community
> experiences." *Id*. at 21.

*Id*., at 653.

Again, the letters corroborate the emotional cost of Mr. Henderson's incarceration on his young child who also recently lost her mother to a fatal illness. In *Bannister*, Judge Weinstein also recognized that "[b]eyond separating convicts from their families and the work force, incarceration imposes numerous collateral consequences." 786 F. Supp.2d at 653. Among those " imposed by law include 'ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon disenfranchisement.'" Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010)." 786 F. Supp.2d at 654. Here, as the PSR notes, at ¶ 130, Mr. Henderson will, as a result of his conviction and imprisonment, be "permanently ineligible for all federal benefits," which will further disadvantage his already underprivileged family.

As Mr. Henderson's letter makes clear, his priority is forgiveness, not just from Nicole and ████for his failure to recognize how important he was to them before it was too late, but from the families that his crimes affected. He writes that finally understanding that ████and Nicole wished only "to have [him] with them more than anything else" made him realize that his actions might have caused similar pain to other families, and his biggest regret is the toll his choices have taken on people other than himself. Henderson Letter (Exhibit 1).

Mr. Henderson writes also that he is ashamed that it took the death of Nicole and his separation from████ when she needed him most to realize that his family members truly value and love him unconditionally, and continue to support him despite the pain he has caused them. He consequently commits every chance he is given to ensuring that████ knows "true fatherly love," the kind of "genuine love" he was taught from an early age he did not deserve. Henderson Letter (Exhibit 1).

In addition to the fact that Mr. Henderson must live the rest of his life knowing that his mistakes cost him priceless time with the woman who was his support system and the center of his life for almost ten years, the sustaining force behind Mr. Henderson's commitment to rehabilitation is his overarching need not only to provide for his daughter financially and emotionally, but also to make up for the pain he has caused her.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 17 of 53

> **3.**   ***Mr. Henderson Is Fully and Genuinely Remorseful, and
> Committed to Rehabilitating Himself, As Demonstrated
> By His Exemplary Record While in Custody at MDC***

Mr. Henderson has demonstrated his remorse for this offense, and for his entire course of criminal conduct, not only by pleading guilty in this case – his first federal arrest and prosecution – without filing motions or engaging in any other contest of the charges, but also through his post-arrest rehabilitative efforts at MDC, and, ultimately, his letter to the Court (Exhibit 1).

In pursuit of his commitment to prove that he is worthy of the support of Nicole and ██████, as well as the rest of his family, Mr. Henderson has been reading newspapers and using the email system to improve his reading, writing and typing. *See* Henderson Letter (Exhibit 1). He has signed up for a financial management class, one of very few educational opportunities at MDC. He has also held multiple jobs at MDC (simultaneously), including as a dishwasher in the kitchen detail, and as a member of the shower detail.

Mr. Henderson earned his GED in May 2005,[6] and until funding was cut, he tutored other inmates at MDC studying for their GED's for approximately eight months.[7] One of those inmates recently passed the exam. Mr. Henderson has received stellar evaluations from his supervisor at his work assignment in kitchen prep at MDC. *See* November 2014 Work Evaluations, attached hereto as Exhibit 9. He has had not suffered any disciplinary problems during his 18½ months at MDC. *See* PSR, at ¶ 6.

During prior periods of incarceration, Mr. Henderson received training and performed work in mechanics, janitorial work, painting and construction work, landscaping, and

---

[6] Although the PSR, at ¶ 111, indicates the New York State Department of Education ("NYS DoE") database does not possess such a record, Mr. Henderson, according to his prison records, as indicated by the supervisor at the Education Department at Willard Drug Treatment Campus, achieved passing scores on the General Equivalency Exam in May 2005. The NYS DoE database can be searched only with a date of birth and social security number. Thus, any clerical error or misremembered numbers would result in misfiled records. Unfortunately, without a copy of Mr. Henderson's birth certificate and social security card (neither of which is readily available), the NYS DoE is unable to find the apparently misfiled record.

[7] MDC's GED program had been suspended until another client of mine successfully lobbied the administration at MDC to reinstitute the program, which he ran until he was transferred from MDC in July 2014. At that point, the GED program again became moribund, depriving Mr. Henderson and his students of ongoing tutoring opportunities.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 18 of 53

maintenance and waste disposal.  Although only intermittently employed throughout his 20's, Mr. Henderson began working at Ms. Rice's beauty salon in the Bronx in 2010, doing odd jobs from painting to secretarial work, and prior to his arrest he was beginning to learn some hairdressing skills.  *See* PSR, ¶ 112-14.  In addition, Mr. Henderson hopes to obtain his commercial driver's license, and he and Ms. Rice began an online real estate broker license course before his arrest, which he plans to complete.

As his letter concludes, his goal is to effectively apply the many skills he has learned and will continue to learn, once he is released.  As his exemplary record over the course of his incarceration demonstrate, Mr. Henderson is already "diligently working to repair his life and work even harder to reach his goals," and he will continue to "strive . . . to become a productive and active member" of society.   Letter from Helena Jones (Exhibit 4).  Mr. Henderson is committed to demonstrating that his friends and family's belief in him is justified.

Again, even prior to *Booker*, post-arrest rehabilitation was recognized as a basis for downward departure from a Guidelines range.  *See United States v. Maier*, 975 F.2d 944, 946-48 (2d Cir. 1992);  *United States v. Williams*, 65 F.3d 301, 305 (2d Cir. 1995).  In those decisions the Second Circuit recognized that a defendant's "awareness of [his] circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society" could warrant a downward departure.  *Maier*, 975 F.2d at 948.

In the post-*Booker* environment, a defendant's post-arrest rehabilitation has even more capacity to constitute a factor on which a sentencing court may properly rely.  *See Pepper*, 562 U.S. ____, 131 S. Ct. at 1236 ("when a defendant's sentence has been set aside on appeal, a district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range")

Indeed, post-arrest rehabilitation is quite relevant to several of the §3553(a) factors a sentencing court is required to consider when imposing sentence.  *See id*. at 1242.  For example, post-arrest conduct "constitutes a critical part of the 'history and characteristics' of a defendant that Congress intended sentencing courts to consider."  *Id*., at 1242, *quoting* §3553(a)(1).  Also, such self-improvement "sheds light on the likelihood that [the defendant] will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence."  *Id*.; *see also* § 3553(a)(2)(B)-(C);  *Williams*, 65 F.3d at 308.

In addition, a defendant's efforts and attitude toward rehabilitation will necessarily inform the sentencing court's duty to "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner."  § 3553(a)(2)(D).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 19 of 53

Here, as requested **post**, at 53, Mr. Henderson respectfully requests a recommendation that he be permitted to participate in the Bureau of Prisons' substance abuse program(s).

Ultimately, as the Supreme Court recognized in *Pepper*, a defendant's post-arrest rehabilitation "bears directly on the District Court's overarching duty to 'impose a sentence sufficient, but not greater than necessary' to serve the purposes of sentencing."  562 U.S. ____, 131 S. Ct. at 1243, *quoting* §3553(a);  *see also United States v. Zimmerman*, 10 CR 598 (JG), 2012 WL 3779387, at *7 (E.D.N.Y. Jun. 19, 2012).

>    **B.**      *Mr. Henderson's Limited Role In the Offense*

Mr. Henderson's role in the offense would also make a sentence within or even near the Career Offender Guidelines incongruous.  Mr. Henderson is charged with a series of street sales of crack cocaine totaling between 11.2 grams and 16.8 grams.  As set forth in the PSR, at ¶¶ 34-41, in three instances Mr. Henderson personally sold small quantities of crack cocaine directly to an undercover law enforcement officer (hereinafter "UC").  PSR, at ¶¶ 35-37.  On three other occasions, Mr. Henderson acted as a "steerer," directing prospective purchasers to other persons who made the sales.  PSR, at ¶¶ 38-40.

That offense conduct demonstrates that Mr. Henderson did not occupy a leadership position in the conspiracy, nor did he profit considerably from his offense conduct.  He was neither supplier nor wholesale distributor, but instead at the lowest levels of the conspiracy: "steerer" or street-level seller.  There is no evidence that Mr. Henderson performed any other functions, reaped any additional remuneration, or served in any hierarchical capacity.  Nor is there any allegation, much less evidence, of any violence or threatened violence on Mr. Henderson's part, or that he possessed a firearm or other weapon.

Limited to his offense conduct, Mr. Henderson's Guidelines level, as calculated in the Plea Agreement and PSR (at ¶ 59), is 18.  Incorporating the three-point reduction pursuant to §§3E1.1(a) & (b), and given Mr. Henderson's placement in Criminal History Category VI, his Guidelines range for that offense conduct would be 41-51 months.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 20 of 53

> **C.** *The Career Offender Enhancements Always and Automatically Increase a Defendant's Guidelines Range Regardless of the Nature of His Prior Offenses*

Even though Mr. Henderson qualifies as a Career Offender, the mere applicability of §4B1.1 does not end the analysis or dictate the sentence, as the other §3553(a) sentencing factors, and the parsimony clause,[8] must be considered in counterpoint to the drastic impact of the Career Offender enhancements. In that context, as a threshold matter, the Second Circuit's decision in *Dorvee*, in which the Court addressed essentially automatic but severe Guidelines enhancements in child pornography cases that placed Guidelines ranges at or near the statutory maximum(s), is particularly pertinent here, too.

In *Dorvee*, addressing enhancements relating to possession of child pornography (§2G2.2), the Circuit noted that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what §3553 requires." 616 F.3d at 184.[9]

The Circuit also explained in *Dorvee* that §2G2.2 is different from most Guidelines in that it is not based on empirical data. 616 F.3d at 186. Indeed, that was a defect in the crack-cocaine Guidelines at issue in *Kimbrough v. United States*, 552 U.S. 85 (2007). The same is true with respect to the Career Offender enhancements as well: they represent merely a point in space chosen arbitrarily, and are not the result of the Sentencing Commission's core function, *i.e.*, assigning Guidelines levels that conform with conclusions based on data compiled from a statistically significant number of cases. *See United States v. Moreland*, 568 F. Supp.2d 674, 688 (S.D.W.Va. 2008).

The Career Offender Guideline was developed by the Sentencing Commission pursuant to a directive from Congress, as part of the Sentencing Reform Act of 1984 [28 U.S.C. §994 (h)],

---

[8] In *Dorvee*, in discussing the "parsimony clause," the Second Circuit reiterated that "[p]lainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of §3553, it could not . . . impose the higher." 616 F.3d at 184, *quoting United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir.2006).

[9] *See also United States v. Tutty*, 612 F.3d 128, 130-33 (2d Cir. 2010) (applying *Dorvee*); *United States v. Bonilla*, 618 F.3d 102, at 110 (2d Cir. 2010) (extending *Dorvee* doctrine to the 16-point enhancement related to illegal reentry conviction); *United States v. Hernandez*, 2010 WL 2522417, at *1 (E.D.N.Y. May 28, 2010) (acknowledging *Dorvee,* but noting that §3553(a) analysis would not alter sentence because defendant received the mandatory minimum term of five years).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 21 of 53

that the Commission set Guideline ranges at or near the statutory maximum for certain specifically described repeat violent and drug offenders.  In formulating this Guideline the Commission's task was to engage in a developmental process that included examination of  pre-Guideline sentences to ensure that the Guideline sentences would not be, on average, materially different from actual time spent in prison by then-current offenders.  *See* 28 U.S.C. §994(m).

Also, the Commission was to review periodically the implementation of those Guidelines by considering feedback from the judiciary and other components of the criminal justice system. *See* 28 U.S.C. §§994(o), (p) & (x).  In addition, Congress directed the Commission to conduct extensive empirical research  by collecting data and studying the relationship of the sentences imposed to the sentencing goals enumerated in 18 U.S..C. §3553(a)(2).   *See* 28 U.S.C. §§995(a)(12)-(16).[10]

Yet, since their promulgation, neither the original Guidelines nor the amendments expanding the class of the offenders has ever been the subject of, or supported by, empirical evidence or reason.  As noted **ante**, the Supreme Court has advised in a number of cases including *Rita v. United States*, *Kimbrough v. United States*, and *Pepper v. United States*, district courts can consider whether a particular Guideline itself can be disregarded (or discounted) because it was based merely on Congressional or Commission fiat, and *not* on empirical evidence.  *See also Dorvee*, 616 F.3d at 184-88.

In *Dorvee*, the Court further examined the extent to which a sentencing court owes deference to the Guidelines when a particular enhancement is not the product of empirical evidence, explaining that the ordinary

> deference to the Guidelines is not absolute or even controlling;
> rather, like our review of many agency determinations, "[t]he
> weight of such a judgment in a particular case will depend upon
>  the thoroughness evident in [the agency's] consideration, the validity
> of its reasoning, its consistency with earlier and later
> pronouncements, and all those factors which give it power to
> persuade, if lacking power to control."  *Skidmore v. Swift & Co.,*
> 323 U.S. 134, 140 [] (1944); *see Kimbrough,* 552 U.S. at 109 []
> (citing the crack cocaine Guidelines as an example of Guidelines

---

[10]  A complete history and examination of the Career Offender Guideline, and its inappropriateness, are set forth in "Deconstructing the Career Offender Guideline," by Amy Baron-Evans, Jennifer Coffin and Sara Noonan, April 25, 2010, which can be found at <http:///www.fd.org/odstb_SentDECON.htm>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 22 of 53

that "do not exemplify the Commission's exercise of its
characteristic institutional role").

616 F.3d at 188.

As a result, the Court in *Dorvee* recognized that under such circumstances

adherence to the Guidelines results in virtually no distinction
between the sentences for defendants like Dorvee, and the
sentences for the most dangerous offenders who, for example,
distribute child pornography for pecuniary gain and who fall in
higher criminal history categories.

616 F.3d at 187.

Confronted with that situation in *Dorvee*, the Court concluded that "[t]his result is
fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or
near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in
§3553(a) that district courts consider 'the nature and circumstances of the offense and the history
and characteristics of the defendant[.]'" *Id.*

In language particularly relevant here with respect to Mr. Henderson, the Court in *Dorvee*
added that mechanical application of such Guidelines enhancements

violates the principle, reinforced in *Gall,* that courts must guard
against unwarranted similarities among sentences for defendants
who have been found guilty of dissimilar conduct. *See Gall,* 552
U.S. at 55 [] (affirming a sentence where "it is perfectly clear that
the District Judge considered the need to avoid unwarranted
disparities, but also considered the need to avoid unwarranted
*similarities* among other co-conspirators who were not similarly
situated" (emphasis in original)).

*Id.*[11]

---

[11]   In *Dorvee*, the Court offered an example of how Guidelines like §2G2.2 create – via
automatic substantial enhancements applied across a broad spectrum of a specific offense
conduct – unwarranted *similarities* among dissimilar defendants: "[e]ven with no criminal

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 23 of 53

Thus, as the Court in *Dorvee* lamented with respect to §2G2.2, "sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." 616 F.3d at 186. Yet, as the Court cautioned, "[i]n all events, even a statutory maximum sentence must be analyzed using the §3553(a) factors." 616 F.3d at 184.

Ultimately, the Court in *Dorvee* reminded that

> [d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 – ones that can range from non-custodial sentences to the statutory maximum-bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.

616 F.3d at 188.

That "broad discretion" exists here as well, even in the context of a defendant with prior drug felony convictions. As the Court concluded in *Dorvee*, "[w]hile we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's sentence stand." *Id*. Here, the same is true with respect to applying the Career Offender Guidelines range to Mr. Henderson.

Unquestionably, Mr. Henderson has an extensive criminal history, including 19 prior adjudications of guilt (including two violations and eleven misdemeanors), all by guilty plea. *See* PSR, at ¶¶ 70-88 and p. 25 (Recommendation). Eight of those offenses occurred before Mr. Henderson turned 21 (the first at age 16, two at age 17, another three at 18, one at 19, and one at 20), *see* PSR, at ¶¶ 70-77, and another three days after he turned 21 (*see* PSR, at ¶ 78). Fourteen involved controlled substances – ten for possession of controlled substances (*see* PSR at ¶¶ 71, 73, 75, 77, 81, 82-85, 88), including five involving marijuana (*see* PSR at ¶¶ 71, 73, 77, 82, 85).

Here, as in *Dorvee*, "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders," 616 F.3d at 187, and someone like Mr.

---

history, this [defendant's] total offense level of 23 would result in a Guidelines sentence of 46 to 57 months. This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.[]" 616 F.3d at 187 (footnote omitted).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 24 of 53

Henderson, who has not committed any violent offenses, and whose prior drug offenses and instant offense involved very small quantities of drugs, is not within that category of "most dangerous offenders," notwithstanding the frequency of his criminal conduct.[12]  As a result, sentencing Mr. Henderson within the Career Offender Guidelines range would result in a sentence that is "fundamentally incompatible with § 3553(a)."  *Id.*

Accordingly, it is respectfully submitted that the onerous effect of the twin Career Offender enhancements upon Mr. Henderson should be ameliorated through consideration of the §3553(a) factors consistent with the principles and concerns expressed in *Dorvee*.

> **D.**   ***The Courts Have Routinely Sentenced Defendants Subject to the Career Offender Guidelines to Sentences Substantially Below That Guidelines Range***

As noted **ante**, whether via downward departures or analysis of the §3553(a) sentencing factors, courts have regularly – in 65.7% of the cases in 2010 – sentenced defendants subject to the Career Offender enhancements to prison terms below the applicable Guideline.[13]  The sentence in this case, too, should fall within that considerable majority of cases in which the prison term imposed was below the Career Offender Guidelines range.[14]

---

[12]  Two of Mr. Henderson's offenses involved *others* using firearms in a reckless manner, *see* PSR, at ¶¶ 72 & 79, for which he was charged and convicted pursuant to the New York State law principle of "acting in concert."  However, in neither case did Mr. Henderson possess or discharge the weapon in question.  Also, the first such offense occurred when Mr. Henderson was 17 years old (1999), and the other when he was 23 (2005).

[13]  According to United States Sentencing Commission statistics, during fiscal year 2010, while 2,314 defendants were subject to the Career Offender guideline; only 34.3% were sentenced within that Guideline range.  Courts departed or relied on §3553(a) factors without a government motion in 27.7% of the cases, with a government motion in 38% of the cases.  *See* February 16, 2012, Statement of Raymond Moore, Federal Public Defender, on the *Current State of Federal Sentencing*, Public Hearing Before the United States Sentencing Commission, *available at* <http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/2012021 5-16/Testimony_16_Moore.pdf>, *citing* the U.S.S.C. 2010 Monitoring Dataset.

[14]  As a threshold matter, the Career Offender Guidelines, like all other Sentencing Guidelines, are advisory.  *See United States v. Corner*, 598 F.3d 411 (7th Cir. 2010) (stating career offender guidelines are advisory).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 25 of 53

As the Second Circuit has held, 28 U.S.C. §994(h), the operative statute in the context of Career Offender sentencing, does not deprive a district court of its authority to sentence below the Career Offender range. *See United States v. Sanchez*, 517 F.3d 651 (2d Cir. 2008) (Congress did not intend for §994(h) to deprive the courts of authority to impose a prison term that is *not* near the statutory maximum).

Similarly, in *United States v. Preacely*, 628 F.3d 72 (2d Cir. 2010), the Court remanded for resentencing "in light of the evidence of [the defendant's] rehabilitation, [which] reinforces [the Court's] doubt that the district judge fully understood his authority to depart from Category VI if it 'significantly over-represent[ed] the seriousness of [the defendant's] criminal history [and/]or the likelihood that [he] will commit further crimes.'". *Id.*, at 82.[15]

In *Preacely*, concurring, Judge Lynch remarked that "even for a man with a history of multiple, if mostly minor criminal convictions, almost exclusively tied to possession and sale of

_____

[15]   Also, every Circuit has authorized downward departure when the Career Offender guideline significantly over-represents the seriousness of the defendant's criminal history (although in most cases courts have concluded that a downward departure from career offender status was not warranted). *See United States v. Rivers*, 50 F.3d 1126 (2d Cir. 1995) (remanding because district court may not have understood it could depart); *United States v. McGee*, 553 F.3d 225, 226 (2d Cir. 2009) (acknowledging that the district court, though it had designated the defendant a Career Offender, ultimately based defendant's sentence on the crack cocaine guidelines "after downwardly departing based on a finding that the career offender classification overrepresented his criminal history"); *United States v. Swint*, 442 Fed.Appx. 614, 616 (2d Cir. 2011) (review of sentence on other grounds, when district court had departed downward and sentenced based on crack cocaine guidelines, and not Career Offender guidelines); United *States v. Grier*, 585 F.3d 138 (3d Cir. 2009) (permitting Career Offender departures based on CHC, but barring offense level departures); *United States v. Adkins*, 937 F.2d 947 (4th Cir. 1991) (permitting departure for Career Offender); *United States v. Fletcher*, 15 F.3d 553 (6th Cir. 1994) (Guidelines allow departure); *United States v. Myers*, 569 F.3d 794 (7th Cir. 2009) (court was aware of its authority to depart); *United States v. Senior*, 935 F.2d 149 (8th Cir. 1991); *United States v. Reyes*, 8 F.3d 1379 (9th Cir. 1993); *United States v. Lawrence*, 916 F.2d 553 (9th Cir. 1990) (affirming downward departure for 52-year-old defendant on grounds that the likelihood of recidivism was low); *United States v. Bowser*, 941 F.2d 1019 (10th Cir. 1991); *United States v. Webb*, 139 F.3d 1390 (11th Cir. 1998) (agreeing with all other circuits that have decided the issue); *United States v. Spencer*, 25 F.3d 1105 (D.C. Cir. 1994). In *United States v. Perez*, 160 F.3d 87 (1st Cir. 1998) (en banc) the First Circuit asked the Sentencing Commission to clarify whether the career offender guidelines categorically banned  downward departures when the past offenses involved small quantities of drugs and a small role.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 26 of 53

narcotics, a sentence of nearly 16 years in prison for the possession of a few thousand dollars worth of cocaine seems remarkably severe." *Id*., at 83.[16]  Here, the quantity involved in Mr. Henderson's offense conduct here (and perhaps encompassing his entire criminal history) does not even remotely approach the "few thousand dollars of cocaine" involved in *Preacely*.

While specific sentencing statistics for defendants subject to Career Offender Guidelines ranges is not publicly available, in 2012 Judge Paul G. Gardephe, in *United States v. Javel Taylor*, 11 Cr. 310 (PGG), contacted the United States Sentencing Commission for certain information.  *See* Transcript, *United States v. Taylor*, November 28, 2012 (hereinafter "Taylor Transcript"), a copy of which is attached hereto as Exhibit 10.

Although the Base Offense Level and Criminal History Category score for the defendant in *Taylor* are not the same as for Mr. Henderson herein, what Judge Gardephe learned is instructive.  As Judge Gardephe reported at sentencing in *Taylor*, he first asked for information for defendants within the Second Circuit "who are at base Offense Level 12 who were nonetheless career offenders.  The numbers were small, but 75 percent of the time there was a non-guideline sentence.  In all of these cases the reduction was not sponsored by the government.  The average reduction was 86 months or about a 48 percent reduction."  Taylor Transcript, at 22.

Next, Judge Gardephe narrowed the inquiry to defendants within the Southern District of New York, "who would otherwise be at a base offense level of 12.  The numbers, of course, are even smaller, but in 100 percent of the cases there was a sentence below the range.  The average reduction was 52 months, which in those cases amounted to an average reduction of 68 percent." *Id*., at 22-23.  Also, Judge Gardephe added that "[n]one of these cases involved a government-sponsored reduction."  *Id*., at 23.

Judge Gardephe concluded that "[t]hese statistics tell me that judges nationwide, in this circuit and this district, have been extremely reluctant to impose a career offender range on defendants with a background similar to Mr. Taylor's.  Indeed, nationwide, in this circuit and in this district, a majority of judges have refused to do so."  *Id*.  Judge Gardephe ultimately sentenced the defendant in *Taylor*, whose Career Offender Guidelines range (after proceeding to trial) was 262-327 months, to an 84-month prison term.  *Id*., at 23, 28.

---

[16]  *See also* United States Sentencing Commission March 2006 *Final Report on the Impact of* United States v. Booker *on Federal  Sentencing*, at 78 (excessive Criminal  History Category constitutes one of the four most common reasons post-*Booker* for non-Guidelines sentences imposed below the calculated range).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 27 of 53

In this case, as well, the sentences the Court has already imposed on five defendants who have been subject to Career Offender Guidelines have demonstrated the inapplicability of the Career Offender Guidelines. In light of the Court's exercise of its sentencing discretion with respect to those defendants, a sentence for Mr. Henderson within those Career Offender Guidelines would create an unwarranted disparity.

Those sentences have been as follows:

| | |
|---|---|
| Ronald Bell: | 37 months |
| Jamel Kennedy: | 120 months |
| Calvin Thomas: | 120 months |
| James Perkins: | 120 months |
| Jose Castro: | 84 months |

While each of these defendants presents individual characteristics that defy specific comparison, it is respectfully submitted that Mr. Henderson's role in the offense mirrors most closely that of Mr. Bell, who was described by the government as an "active street-level dealer and steerer."[17] Indeed, during Mr. Bell's sentencing, he was described essentially as a co-steerer with Mr. Henderson. *See* Transcript, *United States v. Ronald Bell*, 12 Cr. 863-14 (LAP), January 15, 2014, at 8.

As the Court acknowledged during Mr. Bell's sentencing, "defendants who performed similar jobs within this conspiracy received far less than 151 months recommended by the Probation Department and recommended by the Guidelines." *Id*., at 15. In fact, as Mr. Bell's counsel noted, Alex Martinez, a supplier for the organization, received a sentence of 60 months. *Id*., at 7.

Thus, the historical record, as set forth by Judge Gardephe, as well as the sentencing practice in this case, establish that in the Southern District courts have consistently sentenced defendants subject to Career Offender Guidelines to terms of imprisonment substantially below the applicable Guidelines range(s).

---

[17] In contrast, the government described Mr. Thomas as a "prolific street-level dealer."

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 28 of 53

> **E.**   *The Career Offender Guidelines Have a Disproportionate
> and Adverse Impact Upon African-American Defendants*

While the Career Offender Guidelines have withstood constitutional attack, they do have a disproportionate impact upon African-American defendants.[18]  As a result, it is respectfully submitted that such disparate impact upon Mr. Henderson can and should be ameliorated by application of the factors listed in §3553(a).  *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85 (2007).

Certainly the numbers establish that Career Offender Guidelines, like longer sentences for crack cocaine offenses, fall disproportionately upon African-Americans, thereby mirroring the figures for the entire criminal justice system.  As Judge Weinstein noted in *United States v. Bannister*, 786 F. Supp.2d 617 (E.D.N.Y. 2011), "[e]xcessive incarceration has disproportionately affected African Americans." *Id.*, at 651.  *See also id*. ("'[t]oday, a generation after the triumphs of the civil rights movement, African Americans are incarcerated at seven times the rate of whites, nearly double the disparity measured before desegregation'"), *quoting* Robert Perkinson, *Texas Tough: The Rise of America's Prison Empire,* Picador 2010 (2009), at 3.

Also, as Judge Weinstein recognized in *Bannister*, "[r]acial disparities in investigation, prosecution, and sentencing have long existed in the United States."  786 F. Supp.2d at 651, *citing* Lawrence M. Friedman, *Crime and Punishment in American History* (1993), at 377–78, and Thorsten Sellin, *The Negro Criminal: A Statistical Note*, 140 Ann. Am. Acad. Pol. & Soc. Sci. 52, 59 (1928) ("[t]he Negro is not only convicted more frequently than whites, but he seems to receive the heavier sentences").  *See also Race and Punishment:  Racial Perceptions of Crime*

---

[18]   While there appear not to be any Second Circuit cases deciding the issue, other circuits have universally found that the Career Offender statute does not deny a defendant Equal Protection.  *See, e.g., United States v. Hayden*, 898 F.2d 966, 967 (5th Cir. 1990) (Career Offender Guideline does not offend Equal Protection or Due Process);  *United States v. Pritchard*, 317 Fed.Appx. 543, 546 (7th Cir. 2009) (holding that the Career Offender guideline did not violate client's right to Equal Protection when his Illinois drug convictions might have constituted misdemeanors elsewhere, because "[g]eographical disparities in the prosecution of similar conduct raises no equal-protection concern").  In certain respects, the Equal Protection claim with regard to the Career Offender Guideline resembles the challenge to the difference between the offense levels attributable to crack cocaine and powder cocaine.  All of those challenges, including those in the Second Circuit, have failed.  *See, e.g., United States v. Stevens*, 19 F.3d 93, 96-97 (2d Cir. 1994), *citing United States v. Haynes*, 985 F.2d 65, 70 (2d Cir. 1993), and cataloguing cases from other circuits.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 29 of 53

*and Support for Punitive Policies*, The Sentencing Project (2014), available at
<http://sentencingproject.org/doc/publications/rd_Race_and_Punishment.pdf>; Besiki
Kutatelade, *et al*., "Do Race and Ethnicity Matter in Prosecution? (A Review of Empirical
Studies)," Vera Institute of Justice, June 2012, at 16, available at
<www.vera.org/sites/default/files/resources/downloads/race-and-ethnicity-in-prosecution-first-ed
ition.pdf>.

In addition, as Judge Weinstein acknowledged in *Bannister*, "[r]ace-based differences in
incarceration continue today."  786 F. Supp.2d at 652, *citing* Am. L. Inst., *Model Penal Code:
Sentencing* xx-xxi (Tentative Draft No. 2, 2011) (not yet adopted), and Orlando Patterson,
"Black Americans," in *Understanding America: The Anatomy of an Exceptional Nation* (Peter H.
Schuck & James Q. Wilson, eds., 2008), at 398–99 (in 2005, 25 percent of the United States
prison population was African American men between the ages of twenty and thirty-nine); Bruce
Western & Becky Petit, *Incarceration and Social Inequality*, Daedalus (Summer 2010), at 11
(reporting a 68 percent risk of imprisonment for African American male high school dropouts
born from 1975 to 1979, versus 28 percent for Whites of the same demographic).

As the United States Sentencing Commission reported in *Fifteen Years of Guideline
Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the
Goals of Sentencing Reform*, at 133-34 (2004) (hereinafter "*Fifteen Year Report*"),[19] the advent
of the mandatory Guidelines (in 1988) and mandatory minimum sentences heralded a widening
gap between federal prison time served by African-Americans and defendants of other races.
*Fifteen Year Report*, at 113-17, 131-35.

That gulf in time served between African-American and White defendants reached its
apex in 1994, at 37.7 months.  It has since narrowed to 25.4 months in fiscal year 2010, the
lowest since 1992.  Certainly, increased judicial discretion afforded by *Booker* has played a
significant role in that narrowing, and even in preventing a widening of the difference.[20]

---

[19]  The *Fifteen Year Report* is available at
<http://www.ussc.gov/Research/Research_Projects/Miscellaneous/15_Year_Study/15_year_stud
y_full.pdf>.

[20]  *See* Amy Baron-Evans and Kate Stith, *Booker Rules*, U. Penn. L. Rev., Vol. 160: 1631,
SSRN: http://ssrn.com/abstract=1987041.  In 2011, the Sentencing Commission reported that the
gap between African-American and White Defendants in average sentences imposed (for all
offenses in the federal system) was 27 months in Fiscal Year 2010.  United States Sentencing
Commission, *Mandatory Minimum Penalties in the Criminal Justice System*, tbl. 7-3 (2011).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 30 of 53

The gap that exists generally is more acute in the context of drug offenses. *See Bannister*, 786 F. Supp.2d at 652 ("[r]acial disparity in incarceration is particularly stark with regard to drug crimes").[21]  For example, the *Fifteen Year Report* states that "[a]mong drug trafficking offenders only, the [] gap [in length of incarceration in 2004 was] even wider – 92.1 months for Blacks compared to 57.9 months for Whites.  *Id*. at 132.

Also, as noted in *Bannister*,

> [b]etween 1983 and 1987, African Americans and Whites were incarcerated for such offenses in roughly equal numbers." [Joan Petersilia, *When Prisoners Come Home: Parole and Prisoner Reentry* (2003)], at 29.  Between 1983 and 1998, the population of African Americans imprisoned for drug offenses increased twenty-six times, compared to an eighteenfold increase for Hispanics and a sevenfold increase for Whites.  *Id*. at 28 (citing Michael Tonry, *Malign Neglect: Race, Crime, and Punishment in America* (1995)).  African Americans comprised only 11 to 12 percent of the United States population during this period.  *Id*. at 28.

786 F. Supp.2d at 652.

Citing the *Fifteen Year Report*, the Court in *Bannister* further pointed out that

> [a]mong those convicted of drug offenses, racial disparities exist in both the likelihood of imprisonment and the length of imprisonment. [*Fifteen Year Report* at] 122 ("The odds of a typical Black drug offender being sentenced to imprisonment are about 20 percent higher than the odds of a typical White offender, while the odds of a Hispanic drug offender are about 40 percent higher."); *id*. at 123 ("The typical Black drug trafficker receives a sentence about ten percent longer than a similar White drug trafficker.  This translates into a sentence about seven months longer."). *Cf. id*. at 129 (African Americans are less likely than defendants of other

---

[21]  According to the *Fifteen Year Report*, "[i]n 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American.[] *Id*. at 131 (footnote omitted).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 31 of 53

races to receive downward departures under the sentencing
guidelines).

786 F. Supp.2d at 652-53.

Regarding the Career Offender Guidelines in particular, the numbers are stark as well.
The *Fifteen Year Report* states as follows:

> [i]n 2000, there were 1,279 offenders subject to the career offender
> provisions, which resulted in some of the most severe penalties
> imposed under the guidelines.  Although Black offenders
> constituted just 26 percent of the offenders sentenced under the
> guidelines in 2000, they were 58 percent of the offenders subject to
> the severe penalties required by the career offender guideline.
> Most of these offenders were subject to the guideline because of
> the inclusion of drug trafficking crimes in the criteria qualifying
> offenders for the guideline.  (Interestingly, Hispanic offenders,
> while representing 39 percent of the criminal docket, represent just
> 17 percent of the offenders subject to the career offender
> guideline.)

*Fifteen Year Report*, at 133-34.

In his opinion in *Bannister*, Judge Weinstein cites the following passage to that effect:

> Empirical research has established that support for highly punitive
> policies correlates with the tendency to think that Blacks have
> inherently criminal tendencies.  The pattern is consistent at the
> state level:  The size of a state's Black population is a stronger
> prediction of the prison population and its propensity to adopt the
> death penalty than its rate of violent crime.

Doris Marie Provine, *Unequal Under the Law: Race in the War on Drugs*, at 102 (2007)
(citations omitted).

Given the statistics set forth above with respect to the proportion of African-American
defendants arrested and incarcerated for drug offenses, the choices – and limits – of the types of
offenses that qualify for Career Offender treatment – drug and violent offenses – certainly have
chronically and repeatedly exerted an adverse and disproportionate impact on minority

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 32 of 53

communities.  Offenders who commit serial fraud, tax evasion, or other "white collar" offenses are immune from Career Offender designation – without regard to the seriousness of their crimes (including impact on and number of victims), or their  prospect for recidivism – while low-weight, non-violent drug offenders populate the Career Offender universe in droves.[22]

As the *Fifteen Year Report* points out,

> [c]ommentators have noted the relative ease of detecting and prosecuting offenses that take place in open-air drug markets, which are most often found in impoverished minority neighborhoods ([*citing*] Tonry [, *Malign Neglect: Race, Crime, and Punishment in America*], 1995), which suggests that African-Americans have a higher risk of conviction for a drug trafficking crime than do similar White drug traffickers ([*citing*] Tonry [, *Malign Neglect: Race, Crime, and Punishment in America*], 1995; Blumstein, 2000).

*Fifteen Year Report*, at 134.

Consequently, the *Fifteen Year Report* posed a "question for policymakers[,]" –

> whether the career offender guideline, especially as it applies to repeat drug traffickers, clearly promotes an important purpose of sentencing.  Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high.  Incapacitating a low-level drug seller prevents little, if any, drug selling;  the crime is simply committed by someone else.

------

[22]  The *U.S. Sentencing Commission Preliminary Quarterly Data Report*, available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014-4th-Quarterly-Report.pdf>, establishes that, given their relative shares of the total population, African-American convicted in federal court are predominantly between the ages of 21 and 40, while Whites are largely over 40.  *See* Table 25, at 46.  Also, Table 23, *id*. at 44, confirms that relative to population, the percentage of African-Americans convicted of drug trafficking offenses (24.8%) remains disproportionately high.

*Id*.

Even independent of the Career Offender issues, which merely reflect broader trends, a recent National Academy of Sciences report pointed out that although minority offenders' "criminal responsibility is real, . . . it is embedded in a context of social and economic disadvantage." National Academy of Sciences, *Growth of Incarceration In the U.S.* (hereinafter "*NAS Report*"), 2014, at 2, available at <http://www.nap.edu/download.php?record_id=18613>.

As the *NAS Report* notes,

> [t]hose who are incarcerated in U.S. prisons come largely from the
> most disadvantaged segments of the population. They comprise
> mainly minority men under age 40, poorly educated, and often
> carrying additional deficits of drug and alcohol addiction, mental
> and physical illness, and a lack of work preparation or experience.

*Id*., at 2. *See also* Melissa S. Kearney, *et al*., "Ten Economic Facts about Crime and Incarceration in the United States," The Hamilton Project, May 2014, at 7, available at <www.brookings.edu/~/media/research/files/papers/2014/05/01-crime-facts/v8_thp_10crimefacts.pdf>, ("Disadvantaged youths engage in riskier criminal behavior").

Thus, "[m]ore than half the prison population is black or Hispanic. In 2010, blacks were incarcerated at six times and Hispanics at three times the rate for non-Hispanic whites." *Id*. As *The New York Times* pointed out in a 2013 editorial, "[i]n 2010, more than 7 in 100 black me ages 30 to 34 years old were behind bars. The federal system alone holds 219.,000 inmates, 40 percent above capacity . . . Of these inmates, nearly half are in prison for drug-related crimes." Editorial, "Smarter Sentencing," *The New York Times*, August 14, 2013, available at <http://www.nytimes.com/2013/08/14/opinion/smarter-sentencing.html >.

The *NAS Report* added that "[t]he emergence of high incarceration rates has broad significance for U.S. society. The meaning and consequences of this new reality cannot be separated from issues of social inequality and the quality of citizenship of the nation's racial and ethnic minorities." *NAS Report*, at 2. Similarly, as *The Times* recognized in an October 29, 2011, editorial entitled, "Falling Crime, Teeming Prisons," there are serious social and economic costs associated with over-incarceration that *The Times* editorial recognized:

> African-Americans, who make up one-eighth of the population,
> now make up about 40 percent of those in prison. African-
> American men have a one-in-three chance of spending a year or

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 34 of 53

> more in prison.  The trend affects whole communities, depressing
> earnings and increasing recidivism.

*See* Editorial, "Falling Crime, Teeming Prisons," *The New York Times*, October 29, 2011, available at <http://www.nytimes.com/2011/10/30/opinion/sunday/falling-crime-teeming -prisons.html>.[23]

The *NAS Report* concluded that

> [g]iven the available evidence regarding the causes and
> consequences of high incarceration rates, and guided by
> fundamental normative principles regarding the appropriate use of
> imprisonment as punishment, we believe that the policies leading
> to high incarceration rates are not serving the country well.

*Id.*, at 9.[24]

The *NAS Report* further expressed its "concern[] that the United States has gone past the point where the numbers of people in prison can be justified by social benefits."  *Id.*  Instead, the *NAS Report* stated its belief that "the high rates of incarceration themselves constitute a source of

---

[23]  Recently, the Vera Institute of Justice released a report, Ram Subramanian, *et al.*, Incarceration's *Front Door:  The Misuse of Jails in America*, Vera Institute of Justice, February 2015 (hereinafter "*Front Door*"), available at <http://www.vera.org/sites/default/files/resources/downloads/incarcerations-front-door-report.pdf

Summarizing the *Front Door* report, *The New York Times* cited the fact that "[t]he study found that the share of people in jail accused or convicted of crimes related to illegal drugs increased from 9 percent in 1983 to about 25 percent in 2013, and that they were disproportionately African-Americans."  Timothy Williams, "Jails Have Become Warehouses for the Poor, Ill and Addicted, a Report Says," *The New York Times*, February 11, 2015, available at <http://www.nytimes.com/2015/02/11/us/jails-have-become-warehouses-for-the-poor-ill-and-add icted-a-report-says.html>.  *See also Front Door*, at 9-10.  *See also id.*, at 11 ("nationally, African-Americans are jailed at almost four times the rate of white Americans").

[24]  The *NAS Report* also concluded that "[t]he best single proximate explanation of the rise in incarceration is not rising crime rates, but the policy choices made by legislators to greatly increase the use of imprisonment as a response to crime."  *Id.*, at 3.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 35 of 53

injustice and, possibly, social harm.  A criminal justice system that made less use of incarceration might better achieve its aims than a harsher, more punitive system." *Id*.

As a result, the *NAS Report* recommended that

> [g]iven the small crime prevention effects of long prison sentences and the possibly high financial, social, and human costs of incarceration, federal and state policy makers should revise current criminal justice policies to significantly reduce the rate of incarceration in the United States.  In particular, they should reexamine policies regarding mandatory prison sentences and long sentences.

*Id*.

**F.    *General and Specific Deterrence Will Be Adequately Served By a Sentence Below the Advisory Guidelines Range***

Among the principal purposes of the Career Offender enhancements is deterrence.  Thus, as the Second Circuit stated in *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001), "[t]he Commission has explained that the escalating sentence ranges prescribed by the CHCs are intended to achieve the purpose of deterrence[.]" *Id*., at 220, *citing* U.S.S.G. Ch. 4, Pt. A, intro. comment.  Yet, as courts have concluded, for defendants who have not yet experienced extended incarceration, the deterrent purpose is satisfied by a sentence far shorter than the Career Offender Guideline would provide.

For example, in *Mishoe*, explaining why a sentencing court might "depart horizontally" from the Career Offender Guideline, the Court stated:

> [t]he Commission has also recognized that a horizontal departure may be made where a defendant's CHC overrepresents "the likelihood that the defendant will commit further crimes." *Id*. § 4A1.3.  Although the Commission has specified that prior narcotics offenses *count* for purposes of career offender status "regardless of the actual sentence imposed," U.S.S.G. §4B1.2, comment. (n.1), the fact that prior small sentences cannot be disregarded and cannot justify routine horizontal departures for all street-sellers does not mean that the relationship between a particular defendant's CHC VI sentencing range and the time he served on his prior sentences,

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 36 of 53

in combination with other factors (all assessed on an individualized basis), might not warrant a departure.

241 F.3d at 220.

Continuing its rationale, the Court in *Mishoe* pointed out that

[o]bviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years. *Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect.* We think the Commission's sensible recognition that a CHC may overrepresent a defendant's likelihood of recidivism permits a sentencing court, in appropriate cases, to include in its individualized consideration of a section 4A1.3 departure the relationship between the punishment prescribed by a career offender CHC and the degree of punishment imposed for prior offenses. In some circumstances, a large disparity in that relationship might indicate that the career offender sentence provides a deterrent effect so in excess of what is required in light of the prior sentences and especially the time served on those sentences as to constitute a mitigating circumstance present "to a degree" not adequately considered by the Commission. *See* 18 U.S.C. §3553(b).

241 F.3d at 220 (emphasis added).

Consequently, the Court in *Mishoe* concluded the District Court "would be entitled on remand to consider whether to make a departure based on an individualized consideration of factors relevant to the assessment whether CHC VI 'significantly over-represents the seriousness

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 37 of 53

of the defendant's criminal history or the likelihood that the defendant will commit further crimes.'" *Id.* at 219, *citing* U.S.S.G. §4A1.3.

In order to assist the District Court in making such a determination, the Court provided a framework for analysis:

> [s]uch factors might include, for example, the amount of drugs involved in Mishoe's prior offenses, his role in those offenses, the sentences previously imposed, and the amount of time previously served compared to the sentencing range called for by placement in CHC VI. *See United States v. Perez,* 160 F.3d 87, 89 & n. 4 (1st Cir. in banc) (plurality opinion) ("smallness in combination with other factors can provide" a basis for a departure).

*Id.*, at 219.

Here, the Career Offender Guideline prescribes a *minimum* of 151 months, a sentence would be almost three times the aggregate time Mr. Henderson served in custody (approximately 5½ years spread over separate New York State commitments) prior to his current imprisonment, and would be significantly "greater than necessary" to achieve the requisite deterrence. *See Mishoe*, 241 F.3d at 220. *See also United States v. Green*, 2006 WL 3478340 at *6 (SDNY December 1, 2006) (imposing a sentence of 84 months, when the Career Offender range was 188-235 months, and explaining that "[a]s [the defendant] has never been incarcerated for a term of more than a year, a term of imprisonment significantly greater than those previously imposed will achieve the deterrent effect underlying the career offender designation."); *United States v. Hernandez*, 2005 WL 1423276, (S.D.N.Y. June 13, 2005) (ten-year mandatory minimum term – well below the Career Offender range – was based on §3553(a) factors and in light of, *inter alia*, defendant's serious drug addiction, and that he had previously not spent more than 15 months in jail).

Academic literature and clinical research concur that no greater degree of deterrence would be attained by a sentence within the advisory Career Offender Guidelines range compared with a sentence well below that range. Research has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).[25]

---

[25]   In that context, the current research simply confirms the theses proposed by the influential 18th Century Italian philosopher and criminologist Cesare Beccaria, whose analysis

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 38 of 53

In fact, "[t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."  *Id.  See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF (hereinafter "Cambridge Report").

The Cambridge Report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  *Id*. at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Id*.  While there existed significant correlations between the *certainty* of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance."  *Id.* at 2.

---

was praised and quoted with favor by such varied readers as Voltaire, Jeremy Bentham, and John Adams, and who provided three incontestable reasons why proportionality in punishment represents an essential component of any justice system:

(1)      punishment should be only that severe enough necessary to deter crime, and any penalty in excess of that objective constitutes an abuse of power by the state;

(2)      the lack of any distinction between punishments for crimes of inequal kind or degree creates a dangerous and counterproductive equation:  an offender contemplating two offenses, a greater and a lesser, that are punished alike is presented no disincentive to forego the greater for the lesser.  If the punishments are identical, there is no greater risk in attempting the greater;  and

(3)      the punishment should fit the crime, *i.e.*, those who defraud the public should build public works.

Cesare Beccaria, *On Crimes and Punishments* (1764), translated from the French edition by Edward D. Ingraham (Seven Treasures Publications: Lexington, Kentucky 2009), at 70-71, 97. *See also United States v. Canova,* 412 F. 3d 331, 351 (2d Cir. 2005) (citing *Booker*, 541 U.S. at 263, for the proposition "that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of 'avoiding unwarranted sentencing disparities' and 'proportionality'").

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 39 of 53

As a result, the Cambridge Report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Consequently, here, a sentence for Mr. Henderson longer than the Guidelines range for his specific offense condut (41-51months) likely would not achieve any additional general deterrence.

Nor has the inefficacy of longer terms of imprisonment been lost on national public officials. Only last week, Supreme Court Justices Anthony Kennedy and Stephen Breyer appeared before Congress. In response to a question from Rep. Steve Womack (R-AR) regarding whether the United States possessed the "capacity to deal with people with our current prison and jail overcrowding," Justice Kennedy testified, with respect to the corrections system, that "[i]n many respects, I think it's broken." *See, e.g.,* Jess Bravin, "Two Supreme Court Justices Say Criminal-Justice System Isn't Working," *The Wall Street Journal*, March 24, 2015, available at <http://www.wsj.com/article_email/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613-lMyQjAxMTA1NTIzNDUyNTQyWj>. *See also* <sentencing.typepad.com/sentencing_law_and_policy/2015/03/justices-kennedy-and-breyer-urge-congress-to-reform-broken-federal-criminal-justice-system.html>. Video of the Justices' testimony is available from C-SPAN at <www.c-span.org/video/?324970-1/supreme-court-budget-fiscal-year-2016>.

Justice Kennedy added that "[a]nd this idea of total incarceration just isn't working, and it's not humane." *Id*.[26] Similarly, U.S. Attorney General Eric Holder, Jr., has stated that "too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason." *See* Editorial, "Smarter Sentencing," *The New York Times*, August 14, 2013, available at <http://www.nytimes.com/2013/08/14/opinion/smarter-sentencing.html>. What *The Times* editorial described as a "harsher-is-better mind-set" characterized by "widespread incarceration" is, according to AG Holder, "both ineffective and unsustainable."[27]

---

[26] A different approach to corrections, practiced in Norway, was profiled last Sunday's *New York Times Magazine*. *See* Jessica Benko, "The Radical Humaneness of Norway's Halden Prison," *New York Times Magazine*, March 29, 2015, available at <mobile.nytimes.com/2015/03/29/magazine/the-radical-humaneness-of-norways-halden-prison.html?from=promo>.

[27] AG Holder, appearing in the Eastern District of New York to support and encourage that District's alternatives-to-incarceration programs that he described as "'emblematic' of the sort of specialized programs that the nation needs in order to address overincarceration within the federal criminal justice system[,]" told the audience that "[w]e will never as a nation be able to incarcerate ourselves to better outcomes, a stronger nation or brighter futures. Instead we need to

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 40 of 53

The underlying empirical reality recognized by Justices Kennedy and Breyer and AG Holder is that, as the *NAS Report* states, at 2, "[i]n 2012, close to 25 percent of the world's prisoners were held in American prisons, although the United States accounts for about 5 percent of the world's population.  The U.S. rate of incarceration, with nearly 1 of every 100 adults in prison or jail, is 5 to 10 times higher than rates in Western Europe and other democracies."  *See also* Dr. Oliver Roeder, Lauren-Brooke Eisen, and Julia Bowling, *What Caused the Crime Decline?* (hereinafter "*Brennan Report*"), The Brennan Center for Justice (2015), available at <www.brennancenter.org/sites/default/files/analysis/What_Caused_The_Crime_Decline.pdf>.

As a result, "[t]here are five times as many people incarcerated today than there were in 1970." *Brennan Report*, at 3 (footnote omitted).  As *The New York Times* noted in a 2011 editorial, "[i]n the past generation, the imprisonment rate per capita in this country has multiplied by five[,]" and "[s]pending on prisons has reached $77 billion a year[.]"  Editorial, "Falling Crime, Teeming Prisons," *The New York Times*, October 29, 2011, available at <http://www.nytimes.com/2011/10/30/opinion/sunday/falling-crime-teeming-prisons.html>.

Observing these figures, the *NAS Report* concluded, at 2, that "[t]he growth in incarceration rates in the United States over the past 40 years is historically unprecedented and internationally unique."  *See also Brennan Report*, at 3 ("[f]or the past 40 years, the United States has been engaged in a vast, costly social experiment.  It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy").

Yet, as the *NAS Report* points out, at 154, "[t]he deterrent effect of lengthy sentences is modest at best[,]" relying on research and experiments "suggesting that the deterrent effect of sentence length may be subject to decreasing returns."  Jeremy Travis, President of John Jay College of Criminal Justice in New York and co-editor of the *NAS Report*, told *The New York Times* earlier this year "[t]he policy decisions to make long sentences longer and to impose mandatory minimums have had minimal effect on crime. . . .  The research on this is quite clear." Erik Eckholm, "In a Safer Age, U.S. Rethinks Its 'Tough on Crime' System," *The New York Times*, January 13, 2015, available at <http://www.nytimes.com/2015/01/14/us/with-crime-down-us-faces-legacy-of-a-violent-age-.html>.  As a result, *The Times* reported, "[m]any states, led by Republicans as well as by Democrats, have acted to reduce sentences for low-level and nonviolent crimes and to improve drug and other treatment services, while still bringing

_____

make smart choices and smart investments that will help individuals get on the right path and stay out of the criminal justice system."  *See* Andrew Keshner, "Holder Endorses Eastern District Alternatives to Prison," *New York Law Journal*, October 31, 2014, available at <www.newyorklawjournal.com/printerfriendly/id=1202675146471>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 41 of 53

down crime rates." *Id.*


Consequently, one of the *Brennan Report*'s three central findings was that "Increased incarceration at today's levels has a negligible crime control benefit[.]" *Brennan Report*, at 4. Elaborating, the *Brennan Report* observed that

> [i]ncarceration has been declining in effectiveness as a crime control tactic since before 1980. Since 2000, the effect on the crime rate of increasing incarceration, in other words, adding individuals to the prison population, has been essentially zero. Increased incarceration accounted for approximately 6 percent of the reduction in property crime in the 1990s (this could vary statistically from 0 to 12 percent), and accounted for *less than 1 percent* of the decline in property crime this century. Increased incarceration has had little effect on the drop in violent crime in the past 24 years. In fact, large states such as California, Michigan, New Jersey, New York, and Texas have all reduced their prison populations while crime has continued to fall.

*Id.*[28]

---

[28] The *Brennan Report* notes, at 13, that it did not include federal inmates in its analysis. However, the *Report* also explained why adding federal inmates would likely only amplify the findings:

> [t]o study the incarceration variable the authors first sought to include the total incarceration rate, including federal prisons, state prisons, and local jails.  As explained further in Appendix B, federal prison data and local jail data were not available for all the years analyzed and for all states.  For that reason, the authors used state imprisonment data (the number of state prisoners incarcerated in public or private prisons, and the number of *state prisoners* held in local jails).  It does not include individuals in the overall jail population (those held pretrial or serving short sentences), juvenile facilities, or immigration detention centers.  The use of this subset of incarceration is in line with other research in the field.  The exclusion of federal prisoners, juvenile detainees, and the majority of the jail population does not affect the core findings of this

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 42 of 53

In that context, a sentence for Mr. Henderson consistent with the Guidelines range for his specific offense conduct, rather than the Draconian Career Offender Guidelines range, would also be fully consistent with 18 U.S.C. §3582(a)'s requirement that a sentencing court "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation." The Second Circuit and Southern District of New York figures since *Booker*, discussed **post**, at 46-48, reflect that reality, as well as the reality that prison overcrowding as a result of reflexively long Guidelines sentences needs to be addressed.

### G.     *Longer Terms of Imprisonment Do Not Reduce Recidivism*

Nor, according to "the best available evidence" does imprisonment "reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). *See also* Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime and Justice: A Review of Research 102 (2009).

Again, Justice Kennedy concurred during his Congressional testimony last week, as *The Wall Street Journal* reported that "[i]n many instances, [Justice Kennedy] said, it would be wiser to assign offenders to probation and other supervised release programs." Jess Bravin, "Two Supreme Court Justices Say Criminal-Justice System Isn't Working," *The Wall Street Journal*, March 24, 2015, available at <http://www.wsj.com/article_email/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613-lMyQjAxMTA1NTIzNDUyNTQyWj>.

Quoting Justice Kennedy directly, the article added, "'This is cost-effective,' he said, even 'without reference to the human factor' involved in incarceration. 'We have a very low recidivism rate for those who are on release.'" *Id.*

The Sentencing Commissions's *Fifteen Year Report* also repudiated any argument that the Career Offender Guidelines are justifiable based on recidivism issues:

> [m]ost importantly, preliminary analysis of the recidivism rates of

---

report. If that data were included, the rate of incarceration would be even higher than that in the authors' regression. A higher incarceration rate would likely show more dramatic diminishing returns on crime reduction. Accordingly, this report's empirical findings are likely conservative compared to what a more inclusive definition of "incarceration" would produce.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 43 of 53

> drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI. The overall rate of recidivism for category VI offenders two years after release from prison is 55 percent (USSC, 2004). The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent. But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent.

*Id*.

As a result, the *Fifteen Year Report* concluded,

> [t]he recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the *Guidelines Manual*. The career offender guideline thus makes the criminal history category a *less* perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses.

*Id*. (emphasis in original). *Cf. United States v. Wilken*, 498 F.3d 1160 (10th Cir. 2007) (rejecting further reduction than afforded by the District Court – to CHC V – while noting defendant's reliance on the *Fifteen Year Report*'s findings that Career Offenders classified as such based only on prior drug offenses have lower recidivism rates than career offenders whose prior crimes were violent).

Moreover, in the context of recidivism, defendants over 40 years of age present a dramatically reduced danger of recidivism. Mr. Henderson is presently 33 years old, which puts the peak years of potential recidivism behind him. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 ("[r]ecidivism rates decline relatively consistently as age increases," from 35.5% for those under age 21 to 9.5% for those over age 50) (available at <http://www.ussc.gov/publicat/Recidivism_General.pdf>. *See also United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. 2005); Daniel Glaser, *Effectiveness of A Prison and Parole System*, 36-37 (1964); P.B. Hoffman & J.L. Beck, *Burnout – age at release from prison and recidivism*," 12 J. Crim.Just. 617 (1984); *United States v. Clark*, 289 Fed.Appx. 44, 48 (5th Cir.

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 44 of 53

2008) (unpublished opinion).[29]

As a *New York Times* editorial commented last month,

> the persistent fantasy that locking up more people leads to less
> crime continues to be debunked.  States from California to New
> York to Texas have reduced prison populations and crime rates at
> the same time.  A report released last week by the Brennan Center
> for Justice found that since 2000 putting more people behind bars
> has had essentially no effect on the national crime rate.

Editorial, "The Roadblock to Sentencing Reform," *The New York Times*, February 17, 2015,
available at <http://www.nytimes.com/2015/02/17/opinion/the-roadblock-to-sentencing
-reform.html?gwh=58092C4DB7605498FC0E7490098282A6&gwt=pay&assetType=opinion>.

According to a June 2012 study by the Pew Center on the States, entitled *Time Served –
The High Cost, Low Return of Longer Prison Terms* (hereinafter "*Pew Report*"),[30] which
analyzed state data reported to the federal government between 1990 and 2009, "offenders
released in 2009 served an average of almost three years in custody, nine months or 36 percent
longer than offenders released in 1990.  The cost of that extra nine months totals an average of
$23,300 per offender."  *Id*., at 2.

Also, the *Pew Report* found that "for offenders released in 2009 after serving prison
sentences for drug crimes:  2.2 years in prison, up from 1.6 years in 1990 (a 36% increase)."  *Id*.,
at 3.  Nor, with respect to many offenders, was there a correlation between the longer
imprisonment and improved public safety.  As the *Pew Report* concluded,

> [d]espite the strong pattern of increasing length of stay, the
> relationship between time served in prison and public safety has
> proven to be complicated.  For a substantial number of offenders,

---

[29]  According to a recent News Analysis in *The New York Times*'s *Sunday Review* section,
"[n]euroscience suggests that the parts of the brain that govern risk and reward are fully
developed until age 25, after which lawbreaking drops off."  Dana Goldstein, "Too Old to
Commit Crime?" *The New York Times*, March 20, 2015, available at
<www.nytimes.com/2015/03/22/sunday-review/too-old-to-commit-crime.html>.

[30]  The *Pew Report* is available at
http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Prison_Time_Served.pdf.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 45 of 53

> there is little or no evidence that keeping them locked up longer
> prevents additional crime.

*Id.*, at 4. *See also id.* ("[a] new Pew analysis conducted by external researchers using data from three states – Florida, Maryland, and Michigan – found that a significant proportion of nonviolent offenders who were released in 2004 could have served shorter prison terms without impacting public safety").[31]

The *Pew Report* adds that public opinion also supports lower sentences for non-violent offenders:

> [a] national January 2012 poll of 1,200 likely voters revealed that
> the public is broadly supportive of reductions in time served for
> non-violent offenders as long as the twin goals of holding
> offenders accountable and protecting public safety still can be
> achieved.  Voters overwhelmingly prioritize preventing recidivism
> over requiring non-violent offenders to serve longer prison terms.

*Id.*, at 5.[32]

In light of the above-discussed empirical and social science research, Mr. Henderson's outstanding progress during the past 18½ months at MDC – despite the paucity of programming opportunities – demonstrates that a sentence dramatically below the Career Offender Guidelines range, and consistent with the Guidelines range for his underlying offense conduct, would be sufficient to achieve the sentencing goal of specific deterrence with respect to him, and more than adequately address the issue of recidivism.

As discussed **ante,** as the Second Circuit has recognized in *Mishoe*, for someone like Mr. Henderson, who before his recent New York State commitment – which occurred *after* (and in part because of) his offense conduct in this case, had not previously served a prison sentence of

---

[31] *See also Pew Report*, at 5 ("[r]esearch clearly shows there is little return on public dollars for locking up low-risk offenders for increasingly long periods of time and, in the case of certain non-violent offenders, there is little return on locking them up at all").

[32] And legislatures, too, are becoming aware.  As the *Pew Report* states, "a 2006 legislative analysis in Washington State found that while incarcerating violent offenders provides a net public benefit by saving the state more than it costs, imprisonment of property and drug offenders leads to negative returns.[]" *Pew Report*, at 8 (footnote omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 46 of 53

any appreciable length, shorter sentences can accomplish deterrence as effectively as longer terms:  "if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect."  241 F.3d at 220.  *See also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) ("[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame");  Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions").[33]

**H.**      ***The Sentencing Commission's Most Recent Sentencing Statistics***

The United States Sentencing Commission (hereinafter "the Sentencing Commission") publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Preliminary Quarterly Data Report* (hereinafter "*Quarterly Data Report*").[34]  The figures in the most recent version, the *4th Quarter Release, Preliminary Fiscal Year 2014 Data, Through September 30, 2014*, which covers sentences imposed from October 1, 2013 through September 30, 2014, demonstrate that the Guidelines no longer constitute the predominant factor in a decisive majority of sentences in the Southern District of New York (or the Eastern District of New York, either).

For example, the *Quarterly Data Report* reveals that in Fiscal Year 2014 within the Second Circuit, a clear majority of sentences, 69.6%, were *not* within the calculated Guidelines range.  *See Quarterly Data Report*, at 2.[35]  In SDNY, 73.1% of sentences were outside the Guidelines range (along with 74.5% in the Eastern District of New York).  *Id*.  Those numbers

---

[33]  *See also* Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties:  Two Centuries of Consistent Findings*, 38 Crime and Justice: A Review of Research 102 (2009).

[34]  The *Quarterly Data Report* is available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014-4th-Quarterly-Report.pdf>.  Prior *Quarterly Data Reports* are also available on the Sentencing Commission's web site, www.ussc.gov.

[35]  Nationally, only 53.3% of sentences were *within* the Guidelines range (down from 54.8% in Fiscal Year 2013).  *Quarterly Data Report*, at 1.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 47 of 53

represent a continuing trend since *Booker* was decided January 12, 2005:  in the first quarter of 2005, 70.5% of sentences nationally were within the Guidelines range.  *Id.*, at 12.  That number initially decreased to 61.8% by the first quarter of 2006, then remained essentially steady (60.7% for first quarter 2007, and 60.0% for first quarter 2008), before resuming its decline in 2009 and thereafter.  *Id.*

        In addition, only a minute fraction – 1.5% – of all SDNY sentences were *above* the Guidelines range, while 71.7% were *below* the range.  In addition, the reasons for sentences below the Guidelines have evolved as well.  Also, in SDNY, in Fiscal Year 2014 only 20.9% of sentences[36] were attributable to government-sponsored motions,[37] while §3553(a) factors, Guidelines downward departures, and/or a combination thereof were responsible for 50.8% of sentences (all of which were *below* the Guidelines range).  *Quarterly Data Report*, at 3.[38]

        The proportion of sentences in SDNY in Fiscal Year 2014 below the Guidelines, and attributable exclusively to "below range w/ *Booker*" – 45.1% – represents by a wide margin the highest percentage of in that category among *all* districts (with the Northern District of Illinois second at 40.6%).  Also, the proportion of §3553(a)-based below-Guidelines sentences relative to government-sponsored below-Guidelines has increased dramatically since *Booker*.  *Compare*, *U.S. Sentencing Commission Preliminary Quarterly Data Report*, 3rd Quarter Release, Preliminary Fiscal Year 2006 Data, Through July 30, 2006, at 3.[39]

---

        [36]  The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Quarterly Data Report*.

        [37]  Of those, 17.0% were the result of motions pursuant to §5K1.1, and the remaining 3.9% were composed of "§5K3.1 Early Disposition" (1.3%) and "Other Government Sponsored" (2.6%).  *Quarterly Data Report*, at 3.

        [38]  The components of below-Guidelines sentences in SDNY (other than government-sponsored) were classified as follows:  (1)  downward departures alone: 2.9%;  (2)  "downward departure w/ *Booker*": 1.9%;  (3)  "below range w/ *Booker*": 45.1%;  and (4)  "remaining below range": 0.9%.  *Quarterly Data Report*, at 3.

        [39]  In the Second Circuit as a whole, only 30.4% of sentences were within the Guidelines, with 1.4% above the Guidelines range and 61.8% below.  20.1% of sentences were attributable to motions pursuant to §5K1.1, and another 8.2% to other government-sponsored downward departures.  40.1% of sentences were below the Guidelines range without any government sponsorship (via 5K1.1 or otherwise), with *"below range w/ Booker"* alone responsible for 34.4% of sentences.  *See Quarterly Report*, at 2-3.

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 48 of 53

Thus, in SDNY, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception. Even excluding cases involving §5K1.1 (or other government-sponsored) motions, the incidence in SDNY of a below-Guidelines sentence based on §3553(a) factors and/or Guidelines downward departures (50.8% of all sentences) is still nearly double the number of within-Guidelines sentences (26.9% of all sentences).

For drug trafficking offenses (which are not distinguished any further with respect to type of drug or quantity), the data – which are provided in the *Quarterly Data Report* only on a national level – are also instructive. Only 27.5% of drug-trafficking sentences nationally were within the Guidelines range (down from 38.8% in Fiscal Year 2013). *Quarterly Data Report*, at 8. Only 0.8% of all drug-trafficking sentences were *above* the Guidelines, while 71.7% were below the Guidelines. *Id.*, at 8-9. Moreover, of the 4,336 sentences meted out for drug trafficking nationally during Fiscal Year 2014, and in which the sentence was below the Guidelines based on §3553(a) factors alone, the *median* sentence was 46 months, representing a 29.8% "*median* percent decrease from Guideline minimum." *Quarterly Data Report*, at 24 (emphasis added). That, of course, refers to a median percentage decrease from the Guidelines for the drug offense, and not the Career Offender Guidelines (which would likely show a greater percentage decrease from the Guidelines minimum).

Also, of the 298 drug trafficking sentences imposed during the data period, and in which the sentence was below the Guidelines based on a downward departure and §3553(a) factor(s), the median sentence was 37.6% below the Guidelines minimum. *Id.*, at 23. In addition, as Figure H, at p. 37 of the *Quarterly Data Report* establishes, since Fiscal Year 2009 all federal drug sentences have remained on average approximately at least 20% below the applicable Guidelines (as the average sentence has decreased along with the Guidelines range), with that gap widening through Fiscal Years 2013 and 2014.

Thus, any support for a Guidelines sentence pursuant to the Career Offender range for Mr. Henderson in this case not only ignores all §3553(a) factors other than the Guidelines (and particularly as they relate to him), but also defies empirical reality in this district and in this Circuit. As a result, the Guidelines simply no longer reflect a sentence "sufficient but not greater than necessary," and Mr. Henderson's circumstances present a paradigmatic example why they do not.

The Second Circuit and SDNY figures since *Booker* reflect the reality of reflexively long Guidelines sentences. As The Honorable John Gleeson has noted in his academic writing, "the federal prison population has exploded under the Guidelines, and the average sentence lengths have increased dramatically." Hon. John Gleeson, *The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentencing Bargains*, 36 Hofstra L.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 49 of 53

Rev. 639, 657 (2008).

As a result, the Guidelines do not represent a sentence "sufficient, but not greater than necessary" to accomplish the objectives of sentencing with respect to Mr. Henderson. Instead, a prison term consistent with the advisory Guidelines range for Mr. Henderson's specific offense conduct serves that purpose.

I.     ***Sentencing Mr. Henderson Pursuant to the Career Offender Guideline Would Create an Unwarranted Sentencing Disparity In Contravention of §3553(a)(6)***

In sentencing a defendant the Court is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). However, disparity and uniformity are now illusory and misleading concepts in the context of federal sentencing, and therefore lack meaning and influence, particularly with respect to defendants subject to the Career Offender Guidelines.

As noted **ante**, at 24, n. 14, only 34.3% of defendants subject to the Career Offender are sentenced within that Guideline. As noted **ante**, at 46-47, in the Southern District of New York, only 26.9% of *all* sentences are within the applicable Guidelines range. Thus, there is not any standard by which "disparity" can be measured, and there is no longer any "heartland." Indeed, disparity is *the norm* in federal sentencing, and uniformity and disparity – generally and particularly with respect to the Career Offender Guidelines – simply defy definition in that context. *See also* Mosi Secret, "Wide Sentencing Disparity Found Among U.S. Judges," *The New York Times*, March 5, 2012, available at <http://www.nytimes.com/2012/03/06/nyregion/wide-sentencing-disparity-found-among-us-judges.html?_r=0>.

Some of the gross numbers drive the point home. For fiscal years 2006 through 2010, fortunately, federal judges spared nearly 2,500 African American defendants approximately 8,222 years of imprisonment by sentencing them below the Guidelines for crack cocaine convictions, and spared nearly 1,000 African American defendants approximately 5,685 years of imprisonment by sentencing them below the Career Offender Guidelines to which the were subject. Nearly 900 defendants of other races were spared approximately 3,228 years of imprisonment by sentences imposed below both sets of Guidelines.[40]

---

[40]  These estimates were made using the Monitoring Datasets for fiscal years 2003 and 2006-2010. They are based on the increase in the rate of non-government sponsored below-guideline sentences for crack and career offenders in each of fiscal years 2006 through 2010 over the rate in 2003, and the average extent of these reductions in each year. Fiscal year 2003 was used as the comparison year because it preceded the Supreme Court's decision in *Blakely v.*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 50 of 53

In addition, the Career Offender Guideline, by automatically increasing a defendant's offense level and CHC to stratospheric plateaus, create unwarranted *uniformity*, which is just as antithetical to a just and individualized sentencing system as is the unwarranted disparity condemned in 18 U.S.C. §3553(a)(6).  *See, e.g., Kimbrough*, 552 U.S. at 88 (noting that its opinion in *Booker*, 543 U.S. at 263, "recognized that some departures from uniformity were a necessary cost of the remedy [] adopted").  *See also* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules:  Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 AM. CRIM. L. REV. 19, 20-21, 24, 83 (2003) (appellate courts have enforced the Sentencing Guidelines more rigidly than expected or required, creating "'unwarranted uniformity,' which is really just another type of unwarranted disparity").[41]

**J.      *Mr. Henderson Has Endured Pretrial Confinement for More Than 17 Months Under Harsh Conditions at MDC***

Mr. Henderson has spent approximately 18½ months at MDC while on pretrial confinement and awaiting sentencing in this case.   *See* PSR, at ¶ 53 (Mr. Henderson was first produced in S.D.N.Y. September 27, 2013).  The harsh conditions at pretrial facilities – including lack of ample programming, limited family visits, and lack of exposure to sunlight and the outside – are well known to the courts.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520 (1979);  *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).

Thus, even prior to *Booker*, courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure."  *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).  *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure);  *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs);  *United*

---

*Washington*, 542 U.S. 296 (2004), which affected how cases were handled in anticipation of *Booker*.  Fiscal year 2005 was not included because *Booker* was not decided until the second quarter of that fiscal year.

[41]   Even at the inception of the Guidelines, Justice Breyer, in his capacity as Chair of the Sentencing Commission, assured the legal community that the system was intended to recognize that "particular crimes may be committed in different ways, which in the past have made, and still should make, an important difference in terms of the punishment imposed."  *See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. at 9.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 51 of 53

*States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

In *United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006), the court noted that a judge had "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]" *Behr*, at * 5. In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence. *Id. See also* Ken Strutin, "Cognitive Sentencing and the Eighth Amendment," *New York Law Journal*, March 24, 2015, available at <http://www.newyorklawjournal.com/expert-analysis/id=1202721348619/Cognitive-Sentencing-and-the-Eighth-Amendment?mcode=1380566174563&curindex=11>.

Accordingly, it is respectfully submitted that an adjustment below the Guidelines is appropriate to account for Mr. Henderson's extended pretrial custody at MDC.

**III.    *Pursuant to §§5G1.3(b) and/or (d) the Court Should Account for the Time Mr. Henderson Served On His New York State Sentence Prior to His Transfer to Federal Custody, and Reduce His Sentence In This Case Accordingly, and/or Impose the Sentence In This Case to Run Concurrently With Any Remaining Undischarged Portion of His New York State Sentence***

When Mr. Henderson was first produced September 27, 2013, in the Southern District of New York for his arraignment on the Indictment, he was already serving an 18-36 month sentence in New York State prison. That sentence was a composite of two New York State cases: (1) a January 7. 2012, sale of crack cocaine to a New York City Police Department undercover officer, to which Mr. Henderson pleaded guilty and was sentenced June 17, 2013, to 18 months' imprisonment (*see* PSR, at ¶ 86); and (2) a January 9, 2012, possession of crack cocaine while in custody (charged as attempted promoting prison contraband) after the January 7, 2012, arrest noted in item (1) above, to which Mr. Henderson pleaded guilty and was sentenced March 28, 2013, to 18-36 months' imprisonment (*see* PSR, at ¶ 88).

Thus, because Mr. Henderson had been in New York State custody since June 29, 2012, when he was first produced in federal court September 27, 2013 (*see* PSR, at ¶ 53), he had served approximately 15 months in New York State custody on the January 7, 2012, drug sale and the January 9, 2012, possession of crack cocaine. That circumstance raises certain issues implicating §§5G1.3(b) & (d) of the Guidelines.

Guidelines §5G1.3 is entitled "Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment or Anticipated State Term of Imprisonment[.]" Subsection

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 52 of 53

§5G1.3(b) provides as follows:

> (b)    If subsection (a) does not apply, and a term of imprisonment resulted from another
> offense that is relevant conduct to the instant offense of conviction under the
> provisions of [§1B1.3(a)(1), (a)(2), or (a)(3)] (Relevant Conduct], the sentence for
> the instant offense shall be imposed as follows:

>> (1)    the court shall adjust the sentence for any period of imprisonment already
>> served on the undischarged term of imprisonment if the if the court
>> determines that such period of imprisonment will not be credited to the
>> federal sentence by the Bureau of Prisons (hereinafter "BoP");  and

>> (2)    the sentence for the instant offense shall be imposed to run concurrently to
>> the remainder of the undischarged term of imprisonment.

Mr. Henderson's January 7, 2012, arrest certainly qualifies as relevant conduct – as an act
"committed" by Mr. Henderson, *see* §1B1.3(a)(1)(A) – and even was likely in furtherance of the
conspiracy to which Mr. Henderson has pleaded guilty in this case.  The location at which that
sale occurred, 340 Alexander Avenue, is in close proximity to the locations listed as those at
which Mr. Henderson either made or facilitated sales in this case.  *See* PSR, at ¶¶ 35-40.  In fact,
Alexander Avenue runs between Willis Avenue and Third Avenue in that section of The Bronx.
In addition, January 7, 2012, was squarely within the time frame alleged in the Indictment.  *Id.*

Mr. Henderson's 18-month sentence on that case expired approximately three months
after he was transferred to federal custody.  Thus, it is respectfully requested that the Court:

> (i)    adjust Mr. Henderson's sentence in this case to account for the 15 months Mr.
> Henderson served of that New York State sentence before he was transferred to
> federal custody, and for which, as a result, he will *not* receive credit from BoP;
> and/or

> (ii)    recommend that BoP credit Mr. Henderson with the three months of that New
> York State sentence he served while in federal custody on this case, or, if the
> Court determines that Mr. Henderson will not receive such credit, adjust Mr.
> Henderson's sentence in this case to account for those three months as well.

Regarding the 18-36 month sentence for promoting prison contraband, Mr. Henderson's
Conditional Release Date is June 14, 2015.  As a result, Mr. Henderson has continued to serve
that sentence during the entirety of his 18½ month confinement at MDC, and approximately two

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Loretta A. Preska
Chief United States District Judge
Southern District of New York
April 1, 2015
Page 53 of 53

months of that sentence will remain at the time of Mr. Henderson's sentencing in this case.

Thus, §5G1.3(d) applies.  That subsection provides as follows:

(d)      In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

Applying §5G1.3(d), it is respectfully submitted that in order to achieve a reasonable punishment of the instant offense, the Court should impose a sentence that is fully concurrent with the remaining undischarged portion of Mr. Henderson's 18-36 month sentence.

**IV.    *Miscellaneous Issues***

It is also respectfully requested that the Court recommend that Mr. Henderson participate in BoP's substance abuse programs, in particular its Residential Drug and Alcohol Program (hereinafter "RDAP").  *See* PSR, at ¶ 107-09 (summarizing Mr. Henderson's drug and alcohol abuse).

In addition, it is respectfully requested that the Court recommend that BoP designate Mr. Henderson to a correctional facility as close to New York City as possible in order to facilitate visits by his family and friends.

<b>Conclusion</b>

Accordingly, for all the reasons set forth above, it is respectfully submitted that Mr. Henderson should be sentenced to a term of imprisonment well below the Career Offender Guidelines range, and commensurate with the Guidelines range for his specific offense  conduct.

Respectfully submitted,

Joshua L. Dratel

JLD/encls.
cc:   Brendan Quigley
       Rahul Mukhi
       Assistant United States Attorneys